446 So.2d 729 (1984)
STATE of Louisiana
v.
Eric Frank PRUDHOLM.
No. 82-KA-1528.
Supreme Court of Louisiana.
January 16, 1984.
*732 William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., Henry N. Brown, Dist. Atty., James M. Bullers, Asst. Dist. Atty., for plaintiff-appellee.
R. Judge Eames, Baton Rouge, for defendant-appellant.
DENNIS, Justice.
Defendant, Eric Frank Prudholm, was convicted by a jury of armed robbery, La. R.S. 14:64, and aggravated rape, La.R.S. 14:42. He was sentenced to serve fifty years at hard labor without benefit of parole, probation or suspension of sentence for armed robbery and life imprisonment for aggravated rape. We affirm.
In this opinion we refer to the victims of the crimes as Mr. and Mrs. Victim in order to protect the identity of the woman who was raped.
*733 On June 8, 1981, at approximately 5:15 a.m., Mrs. Victim was brutually raped by two black men in her motel room in Bossier City, Louisiana. Mrs. Victim, her husband, and their two children were guests of the Drummer's Inn. In the early morning hours Mr. Victim was forced from the bathroom of his motel room at gunpoint by a black man. Mr. Victim was forced to lie on his children's bed while another black man raped his wife on the adjacent bed. During the rape, Mr. Victim's car keys and wallet were thrown to a third black man standing near the door of the room. After the rape was completed, Mr. Victim's captor switched places with the first rapist and raped Mrs. Victim again. The third man left the motel room, presumably to search the car for valuables. Two of the men then bound the family securely and left the scene, taking with them Mr. Victim's wallet and some jewelry.
After a brief struggle, Mr. Victim freed himself and phoned the police. Several officers arrived and collected physical evidence from the scene, including several partial fingerprints and the bedclothes from the bed on which Mrs. Victim had been raped. The officers also obtained a description of the perpetrators of the crime from her, but because she was in an emotional state of shock this description was limited to general characteristics including height, skin tone, and hair style and length.
Mrs. Victim was taken to a local hospital and examined by the coroner of Bossier Parish. Test results revealed that Mrs. Victim had recently had sexual contact, and the presence of live sperm suggested that this contact was more recent than the voluntary intercourse she had engaged in with her husband the previous evening. The coroner noted that Mrs. Victim was in an emotional but coherent state and that while she could answer specific questions she could not fully assist him in showing him where her assailants had touched her. Several physical samples were taken from Mrs. Victim, including blood, saliva, vaginal washings, and pubic hair.
In late August, policemen presented Mrs. Victim with a photographic line-up at her home. She identified James Gladney, a co-defendant in this case, as one of her assailants. Gladney had become a suspect after his arrest for another offense. In September, three and one-half months after the attack, Mrs. Victim was presented with two more photographic line-ups from which she identified the defendant as the other man who raped her and co-defendant Reggie Hicks as the third participant in the robbery. Mrs. Victim testified that she broke down in tears when she saw Prudholm's photograph. Prudholm and Hicks had become suspects due to their association with Gladney.
The three co-defendants were tried jointly. Mr. Victim testified that he was unable to provide any identification of the perpetrators of the crime because during most of the time the crime was in progress he was facedown on the bed. Mrs. Victim provided the central piece of state's evidence by positively identifying Gladney and Prudholm as the men who raped her and Hicks as the third man present in the room. She testified that there was sufficient light in the motel room to see the three men. Although it was dark outside when Mrs. Victim awakened she was able to see all three men while the outside door was open. During part of the time the assailants were in the victims' room, an outside light shone in through the open door. Further, Mrs. Victim testified that light from the bathroom door permitted her to see Prudholm while he held a gun on her husband on the adjoining bed prior to his raping her.
The remaining evidence against the defendant consisted of testimony by a criminologist who had examined the samples taken from Mrs. Victim, the physical evidence secured from the motel room, and blood, saliva and public hair samples taken from the three co-defendants. Of the partial fingerprints taken, only two were of sufficient clarity to be useful. However, of these two, neither contained more than three of the minimally required eight "points" or traits for a positive identification. *734 The three points did not match any of the three codefendants.
Five negroid pubic hairs found on the bed sheet taken from the motel room were compared with samples taken from the codefendants. Of these, four did not come from any of the codefendants, but one was sufficiently similar to support the conclusion that it could have come from Prudholm.
The laboratory samples taken from Mrs. Victim revealed that one of her attackers was a secretor[1] and had blood type B. The other was possibly a secretor with blood type O, but because Mr. Victim was also a secretor with blood type O, it was impossible to be certain. Comparison of these findings with the samples taken from the codefendants revealed that both Gladney and Prudholm could have been among the rapists, the former being a secretor with blood type B and the latter a secretor with blood type O. Hicks was found to be a non-secretor.
The defendant filed a motion for a new trial based on newly discovered evidence which refutes the victim's identification. A hearing was held on this matter, and the following testimony was adduced.
Mrs. Sue Prudholm, the defendant's mother, testified that the defendant lived with her in Compton, California. She testified that the defendant did not leave California to come to Louisiana until July 5, 1981, well after the June 8 attack upon the victims. She said a birthday party was held for Prudholm and his younger brother at her home on June 27 and Prudholm attended. She stated that Prudholm came to Louisiana against her wishes on July 5 with Fredrick Hicks, codefendant Hicks' brother. After Prudholm was arrested in September and formally charged on October 1, his mother allegedly attempted unsuccessfully to contact Prudholm's court appointed attorney, and she came to Louisiana for the scheduled trial of her son on November 24, 1981. When the trial date was continued, she returned to California with the belief that she would be contacted when her son was to be tried.
Defendant's brother-in-law, William Harold McKinney, Jr., a self-employed contract machinist with a Bachelor of Arts in History and a Masters of Arts in theater from UCLA, corroborated Mrs. Prudholm's testimony. McKinney stated that he knew Prudholm was in California throughout June of 1981 because he could remember three specific instances in which he saw him: (1) June 6, 1981 at the Kool Jazz Festival in San Diego, (2) one week later at the National Technical School in Los Angeles, where Prudholm had gone to observe McKinney while he was teaching auto mechanics, and (3) the birthday party at Mrs. Prudholm's home. McKinney also testified that there were many occasions in June on which he saw Prudholm, but he could pinpoint no dates. At that time McKinney was dating Prudholm's sister, and he frequently visited the Prudholm home.
Reggie Hicks, the codefendant who was convicted of armed robbery but not for rape, testified at the hearing on the motion for a new trial. He recanted his trial testimony that he had not been present during the commission of the crimes, and admitted his complicity in the affair. He stated at the hearing on the motion that he was guilty of the robbery, but that Prudholm was not present during the commission of the crimes. He named as his accomplices and as the rapists Gladney and Kirk Johnson. Hicks described Johnson as a light skinned black man, about five feet eight or nine inches tall, who had a long afro. Johnson's appearance matched Prudholm's with the exception that Prudholm had large acne pocks on his face and tattoos on his forearms and at the time of the rape, Prudholm did not wear his hair in an afro, as described by Mrs. Victim to the police; rather his hair was worn in a Jeri curl, a style resembling Caucasian hair which has been permed.
Aside from the live witness testimony educed at the motion for a new trial, defense introduced affidavits of several relatives, *735 among them defendant's grandmother, two sisters and an aunt who all stated that they had seen and talked to Prudholm in California during June and early July. Fredrick Hicks executed a statement which said that he and his wife left Louisiana for California on June 23, 1981 and returned on July 5 accompanied by Eric Prudholm.
Prudholm's trial attorney, M. Randal Fish, was called as a witness at the hearing on the motion. He testified that Prudholm had told him that he possibly was in California at the time of the offense, but that he could not remember with any certainty when he came to Louisiana with Hicks. Prudholm had told him that it was late spring or early summer. The attorney stated that his pursuance of the possible California alibi was limited because his investigator had been terminated due to budget cuts in his office. The attorney spoke with Fredrick about the travel dates from California to Louisiana and Hicks suggested that his employer would know the dates. Hicks' employer told the attorney that April, not late June, was the time when Hicks took time off. Further, the trial counsel thought that his secretary had checked with the airline which Hicks used to go to California and the airline records coincided with the employer records. The attorney testified that he never received any messages from Mrs. Prudholm, and that his contacts with Prudholm prior to trial included an initial interview in early October 1981 and a fifteen minute visit to jail and on arraignment day, November 3, 1981. He stated that he had seen Mrs. Prudholm in the hall of the courthouse, but that he only spoke with her briefly because he was late for a court appearance. Fish also attempted to have Fredrick Hicks sequestered in case he needed to call him as a witness, but Hicks protested vehemently that he knew nothing and refused to cooperate.

Assignments of Error Numbers 16, 17, 18 and 20
On appeal, defendant alleges 22 assignments of error which comprise six arguments. Assignments of error 16, 17, 18 and 20 form defendant's arguments that the trial court erred in denying defense motion for a new trial based on newly discovered evidence and that Prudholm's court appointed counsel performed ineffectively.
Louisiana Code of Criminal Procedure article 851 provides in pertinent part that:
The court, on motion of the defendant, shall grant a new trial whenever: ...
(3) New and material evidence that notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict of judgment of guilty....
This rule contains the four generally recognized requisites for the motion for a new trial based on newly discovered evidence: (1) the evidence must have been discovered since the trial; (2) failure to learn of the evidence at the time of trial was not due to defendant's lack of diligence; (3) it must be material to the issues at the trial; (4) it must be of such a nature that it would probably produce an acquittal in the event of retrial. State v. Talbot, 408 So.2d 861, 884 (La.1981) (on rehearing); Moore, 8A Federal Practice § 33.03[1] at pp. 33-18 and 33-19 (2d ed. 1983); Wright, 2 Federal Practice and Procedure: Criminal § 557, p. 515 (2d ed. 1982).
The application of these precepts to newly discovered evidence by the trial judge, although a question of law, is entitled to great weight, and his discretion should not be disturbed on review if a reasonable man could differ as to the propriety of the trial court's action. See, e.g., State v. Talbot, supra at 885; State v. Jackson, 253 La. 205, 217 So.2d 372 (1968); State v. Truax, 222 La. 463, 62 So.2d 643 (1952). On the other hand, the discretion vested in the trial court must be exercised in whole-hearted good faith and be guided by the statutes, not by the court's private opinion of what the statute ought to be. *736 State v. Talbot, supra, at 885; State v. Gilmore, 332 So.2d 789 (La.1976); State v. Randolph, 275 So.2d 174 (La.1973). The trial judge's duty is not to weigh the new evidence as though he were a jury determining guilt or innocence, rather his duty is the narrow one of ascertaining whether there is new material fit for a new jury's judgment.
Applying these tenets to the case at hand we find no abuse of the trial judge's discretion in denying the defendant's motion for a new trial. A review of the record shows that much of the alibi evidence offered by witness testimony and by sworn statements of defendant's relatives was neither new nor, with ordinary diligence, undiscoverable at trial. While there was some newly discovered evidence material to Prudholm's defense, we cannot say that it would probably have produced an acquittal in the event of retrial.
Alibi evidence urged on the motion for a new trial is not "`newly' discovered if it could have been discovered" before or during trial. See, e.g., U.S. v. Iannelli, 528 F.2d 1290 (3rd Cir.1976). If a defendant was aware before trial of the facts which tend to show an alibi included within affidavits in support of a motion for a new trial, the facts are not "newly discovered evidence" supporting a new trial motion. Cleary v. U.S., 163 F.2d 748 (9th Cir.1947) cert. den. 333 U.S. 864, 68 S.Ct. 736, 92 L.Ed. 1143). Despite defendant's memory lapse concerning his trip to Louisiana, his first visit to the state which had occurred by all accounts within six months prior to his arrest, we believe that he should have known his whereabouts in June, especially after his attorney attempted to prompt his memory.
Furthermore, we conclude that the defendant failed to carry his burden of proving that his failure to learn of the new evidence was not due to his lack of reasonable diligence. Whether sufficient diligence was exercised must be determined from the composite knowledge and conduct of both the accused and his counsel. Wright, 3 Federal Practice and Procedure: Criminal § 557, pp. 327-329 (2d ed. 1982). Although the defense counsel's performance was adequately diligent, the defendant himself lacked the requisite diligence in discovering his alibi evidence and in assisting counsel in developing that defense. Prudholm testified at the hearing for a new trial that he only told his lawyer he could not remember when he came to Louisiana with Fredrick Hicks but perhaps his mother or grandmother could recall the date of his California departure. He testified several times that he was unconcerned about telling his attorney anything more concerning his alibi because he thought he was going to be released at a preliminary hearing. Despite continued incarceration without being called to a preliminary hearing, defendant did not inquire of Fish's associate, Pat Phillips, who visited him in prison to discuss a plea bargain, whether his alibi was being investigated. The derelictions by Prudholm defeat any claim that the evidence presented at the motion for a new trial was not discoverable with the exercise of reasonable diligence before or during the time of trial.
Similarly, we find no error in the trial judge's refusal to order a new trial based on Reggie Hicks' recantation of his earlier testimony and statement at the motion for a new trial that Prudholm was not present at the rape scene and had not raped Mrs. Victim, but that another man, Kirk Johnson, had actually committed the crime. In considering Hicks' recantation, we adhere to our previous view that recantations are highly suspicious and, except in rare circumstances, a motion for new trial should not be granted on the basis of a recantation since that disclaimer is tantamount to admission of perjury so as to discredit the witness at a later trial. State v. Clayton, 427 So.2d 827 (La.1982). Since there are no special circumstances which would suggest that Hicks' latest testimony is truthful, the trial judge reasonably could have concluded that Hicks' recantation would not have created a reasonable doubt of guilt in the mind of any reasonable juror.
*737 Hicks attributed his recantation to his desire to prevent an innocent man from going to jail. However, the record shows that Hicks had already been convicted and sentenced on the simple robbery charge, therefore, any potential retribution for perjury would have been minimal. That Hicks' testimony incriminated his close friend Gladney carries little weight since Hicks knew that Gladney had recently been convicted of an unrelated rape and sentenced to life in prison. Moreover, that Hicks' sister was Prudholm's girlfriend suggests that Hicks' may have acted at her behest. We agree with the trial judge that Hicks would not have been a credible witness and that the repudiation of his testimony would not have been persuasive before a new jury.
While we do not necessarily find that Prudholm's court-appointed counsel lacked diligence, we find possible merit in defendant's claim that the attorney was hampered by a recent budget cut which left him overworked and without an investigator. While defendant's mother criticized Mr. Fish's effectiveness at the new trial hearing because she claims she made repeated unsuccessful attempts to contact him to discuss her son's case, the indigent defender stated that he never received any of her messages, and he only spoke with her once in the hallway of the courthouse as he hurried to another trial. Whether the constraints imposed on Mr. Fish caused his performance to be sub-standard so as to deprive defendant of his constitutional right to reasonably effective assistance of counsel cannot be determined from the record on appeal. Rather, defendant's remedy is through post conviction relief in the trial court where the quality of the attorney's assistance can be fully developed and explored. See La.C.Cr.P. art. 924 et seq.

Assignments of Error Numbers 4, 7, 12 and 13
Through assignments of error 4, 7, 12 and 13, defendant argues that the trial court erred in denying his motion for a mistrial based on the prosecution's failure to disclose exculpatory evidence pursuant to La.C.Cr.P. art. 718.
Prior to trial defendant filed a general request for production of all exculpatory evidence and information. The State's initial answer failed to disclose the existence of any exculpatory evidence. However, at 3:00 p.m. on Friday, December 11, prior to the opening day of trial the following Monday, the State supplemented its answer by revealing the results of analysis of five negroid hairs found on the bed linen where the rape occurred as those hairs compared with pubic hair collected from Prudholm and his codefendants. Tests showed that four of the five hairs had not come from any of the defendants. The fifth hair was sufficiently similar to Prudholm's hair so that it could have come from him. Despite the State's tardy production of evidence, the hair analysis results were introduced and submitted to the jury for inspection during the close of the state's case. Defendant contends that had he known about the dissimilar hairs in advance of trial, he perhaps could have obtained witnesses who would have testified that the bed linens were changed the day before the rapes. This would have made more effective, he argues, the argument his attorney made to the jury that the identification of at least one of the defendants as the perpetrators was incorrect, because four of the five specimen hairs did not come from any of the defendants. Since his motion for a continuance to supplement his defense was denied, Prudholm claims he was surprised and unduly prejudiced by the belated evidence.
The right to be protected against the prosecution's failure to reveal its possession of exculpatory evidence is founded upon the due process clause and is designed to assure a fair trial. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In United States v. Agurs, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) the Supreme Court established categories of evidence to which the Brady rules apply and set forth standards *738 of review in conjunction with these categories. See, also, State v. Willie, 410 So.2d 1019 (La.1982). The undisclosed evidence in Prudholm's case falls into Agurs' "general request" category. If a general request, or no request at all, is made for exculpatory materials a conviction will only be overturned if the omitted evidence creates a reasonable doubt that did not otherwise exist. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. However, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.
Disclosure by the state must be made at such a time as to allow the defense to use the favorable material effectively in the presentation of its case. U.S. v. Pollack, 534 F.2d 964 (D.C.Cir.1976). However, the trial judge must be given a wide measure of discretion in determining whether a tardy disclosure jeopardizes effective utilization of the evidence and what remedy, if any, should be granted. Id.
We cannot say that the trial judge abused his discretion in determining that the timing of the state's disclosures had not deprived the defense of effective use of the evidence and in denying a continuance. The additional value of evidence that the bed linens in the Victims' room had been changed the day before the rapes to Prudholm's theory would have been quite limited. Since it could be expected that the motel would have changed linens before the Victims checked into their room, the defense attorney could and did make a vigorous misidentification argument almost as effectively as he could have with the additional evidence. Furthermore, even if the defense could have obtained such evidence within the period of a reasonable continuance, it would not have diminished appreciably the possibility that one of the pubic hairs found in the room was Prudholm's. Whatever additional evidence favorable to the defense could have been produced by earlier revelation of the pubic hair evidence would not have introduced an element of reasonable doubt of Prudholm's guilt into the jury deliberations.

Assignments of Error Numbers 3, 8 and 19
Defendant argues through Assignments of Error 3, 8 and 19 that the procedure relating to photographic identification of Prudholm was suggestive and, therefore, tainted any later identification of Prudholm. Prudholm argues that while he is light skinned, seven of the nine photographs included within the array depicted dark-complexioned persons which unfairly singled him out. Additionally, the defendant challenges Mrs. Victim's identification since the lighting in the hotel room where the rape occurred was dim and because her photo identification of defendant occurred three and one half months after the crime, too late for her to clearly recall her attacker's appearance.
A defendant attempting to suppress an identification must prove both that the identification itself was suggestive and that there was a likelihood of misidentification as a result of the identification procedure. State v. Chaney, 423 So.2d 1092, 1098 (La.1982); Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). In Manson, the court considered these five factors in determining whether the identification was suggestive: (1) the witness's opportunity to view the defendant at the time the crime was committed; (2) the degree of attention paid by the witness during the commission of the crime; (3) the accuracy of any prior description; (4) the level of the witness's certainty displayed at the time of identification; and (5) the length of time elapsed between the crime and the identification.
Applying the Manson factors to the present case we find that the identification procedure did not produce the likelihood of misidentification. Mrs. Victim's assailants remained in the hotel room between 30 and 45 minutes, ample time for her to observe Prudholm and his accomplices *739 so that a later accurate identification was possible. While the victim testified that she was instructed to keep her eyes closed, she explained that she repeatedly opened her eyes and watched the intruders. The record shows that Mrs. Victim particularly observed the intruder whom she identified as Prudholm, since she first saw him holding a gun to her husband's head and later as he confined Mr. Victim to the adjoining bed with the couple's children. Further, Mrs. Victim was face-to-face with the rapist during the assault with his face only inches away. Since this witness was the rape victim, as opposed to a mere observer, and since the record shows that she paid close attention to the three men who burst into her hotel room, there is sufficient evidence to show that the requisite degree of attention was present for a later identification.
The victim's description immediately following the crime was general. She told police that the man with the gun who later raped her was tall with light skin and had a tight afro. Police testified that the victim had a "blank look on her face" at the time she gave the description, suggesting emotional shock. The coroner's account of the woman just after the attack revealed that she was in an emotional state so that he could only obtain limited information from her. The defendant's appearance conforms to her post-offense description to the extent that he is tall and light skinned. That Prudholm wore a slightly different hair style than what the victim described and had acne pocks, which she failed to mention, carries little weight considering her state of mind after the crime.
Considering the fourth Manson factor, the victim's unwavering certainty that Prudholm was the second rapist is most compelling. When the police officer took the photo array to Mrs. Victim's house he told her only that he had some pictures for her to see and that she might or might not recognize someone. He did not suggest that she might identify Prudholm. When the officer arrived he gave the woman a stack of nine photographs which included the defendant's picture somewhere in the middle of the group. The woman laid the photographs out on her kitchen table and carefully picked up each one to examine it. After returning to Prudholm's likeness several times to reexamine it, she recognized him and became so emotional that she ran to her bedroom to compose herself. The record shows that this identification took place within five minutes. Mrs. Victim was firm in her testimony at the motion to suppress and at the trial that Prudholm was actually one of the intruders who raped her.
Finally, we do not believe that the three and a half month period which elapsed between the June rape and the victim's September identification would likely have erased or blurred her memory of her assailant's face on that traumatic occasion.
Therefore, in view of all five factors indicative of a suggestive identification, we believe that the record supports Mrs. Victim's identification of Prudholm as her attacker. Further, we do not believe that the photographs themselves produced a tainted identification. While Prudholm criticizes the photographs within the array as too dissimilar to produce a fair identification, Mrs. Victim later testified that she thought four of the nine men depicted were light-skinned. However, there is little merit in defendant's criticism of the photographs mainly because Mrs. Victim was not told that she was necessarily looking for Prudholm or someone of his general description. She was told that she might or might not see someone she recognized. Too, there were three intruders in her hotel room and the line-up could have included photographs of the other two men.[2] Even *740 assuming arguendo that the photographs were suggestive, considering other relevant factors, e.g., the victim's opportunity to view her attackers and her certainty that Prudholm raped her, we find no evidence that the photo line-up led to misidentification, which is essential to a successful attempt to suppress evidence.

Assignments of Error Numbers 6 and 10
Through assignments of error 6 and 10 defendant complains that the trial judge's refusal to provide a transcript of Mrs. Victim's pre-trial statement for use during defense cross-examination contravened his constitutional rights of cross examination and confrontation.
Following the rape, Mrs. Victim described her assailants to police officers who repeated it in their crime report. On the day before trial the woman read her initial statement to refresh her memory. At trial the judge denied defense counsel's request to review a copy of the report. However, the officers who recorded the initial statement, testified to Mrs. Victim's original statement, and their testimony was consistent with the woman's testimony given at trial.
La.R.S. 15:279 provides that a witness may refresh his memory by reference to prior testimony or memoranda so long as after the inspection the witness can testify to fact. While our courts have compelled production of police reports used during trial to refresh memory, see e.g., State v. Valentine, 375 So.2d 1378 (La.1979), such production has not been mandated when the witness refreshed his or her memory pre-trial. State v. Payton, 294 So.2d 211 (La.1974). See also, State v. Franks, 363 So.2d 518 (La.1978).
Even assuming that the law required production in this case, we would nonetheless find the error harmless. The two officers who compiled the police report which included the description testified to Mrs. Victim's statement describing her assailants, and her own testimony conformed to theirs. Accordingly, this assignment of error has no merit.

Assignments of Error Numbers 1, 2, 9, 11, 14, 15 and 20
Defendant's final argument, embodied within assignments of error 1, 2, 9, 11, 14, 15 and 20, is that a new trial should have been granted as a result of the trial court's failure to sever his trial from that of codefendants Hicks and Gladney.
The pretrial motion for a severance was based on the general allegation that the defenses of the three defendants were antagonistic. The contentions on the motion for a new trial were that Prudholm was convicted by "guilt by association" with Gladney, who two months earlier had been convicted of another rape and robbery, and that defendant was unconstitutionally deprived of his right of confrontation since he was barred from calling his codefendant Gladney as a defense witness.
Defendant specifically claims that a police officer witness's testimony mentioning "other crimes" charges against Gladney caused the jury to view Prudholm unfavorably as an associate of criminals. When defense counsel asked the officer to pinpoint the time of his first contact with defendant Hicks, the witness responded that it was shortly after Gladney was arrested on a separate charge. The officer had already stated that he talked to Hicks in August, and it was only when defense counsel urged him to give a more specific answer that he mentioned the other non-specified charge against Gladney. After this testimony Prudholm's counsel objected and moved for a mistrial, but the judge overruled the motion and admonished the jury to disregard the answer.
La.C.Cr.P. art. 704 provides that jointly indicted defendants shall be tried jointly unless: (1) The State elects to try them separately; or (2) The court, on motion of the defendant, and after contradictory hearing with the district attorney, is satisfied that justice requires a severance. *741 Louisiana's settled jurisprudence interpreting art. 704 is that a trial judge's determination of whether to grant or deny severance rests in his sound discretion, and this court will not reverse his ruling absent clear abuse. State v. Jenkins, 340 So.2d 157, 166 (La.1976).
Whether justice requires a severance must be determined by the facts of each case. State v. Turner, 365 So.2d 1352 (La.1978). A severance is necessary if the defenses of the codefendants are mutually antagonistic to the extent a codefendant attempts to place the blame on the other, causing each defendant to defend against his codefendant as well as the State. Turner, supra, at 1354. However, the mere unsupported allegation that defenses will be antagonistic is not sufficient to require a severance. State v. Turner, supra.
We find no abuse of discretion in the judge's denial of the pretrial motion to sever since defendant failed to support his general assertion that the defenses would be antagonistic.
Similarly, we find no error in the trial court's rejection of Prudholm's motion for a new trial based on his inability to call codefendant Gladney as a witness. The bare assertion that a joint trial would deprive defendant of the right to call codefendants as witnesses is not of itself a sufficient ground to grant a severance. State v. Turner, supra at 1354; State v. Medlock, 297 So.2d 190, 193 (La.1974). Granting a severance under such circumstances would be futile since codefendants can still plead the privilege against self-incrimination at separate trials. State v. Turner, supra; State v. Medlock, supra. Rather, the defendant must make some showing that his codefendant is willing to testify in his behalf if a severance is granted. State v. Jenkins, supra, at 166-167. Having made no showing that Gladney would have willingly testified in his behalf, a new trial based on refusal to sever was properly denied.
Further, we find no error in rejecting the request for a mistrial based on the police officer witness's allusion to other charges against Gladney. The record reflects that the reference to the other charges was volunteered by the witness in an unresponsive answer to defense counsel's question. Prudholm argues that the officer's remark cast him in an unfavorable light as a person who associated with criminals.
Since the challenged remark was made by a witness, as opposed to the judge or another court official, a mistrial is not mandated by the Code of Criminal Procedure. La.C.Cr.P. art. 770. A judge may grant a motion for a mistrial if a witness's remark is so prejudicial that an admonition to the jury to ignore the statement is not sufficient to assure the defendant a fair trial. La.C.Cr.P. art. 771. See also, La.C. Cr.P. art. 775. In the instant case there is no indication that the judge's admonition was inadequate so that the gratuitous remark effectively prejudiced Prudholm or jeopardized his due process right to a fair trial. Therefore, Prudholm's argument that failure to sever his trial from that of his codefendants entitles him to a new trial is meritless.

Decree
Accordingly, the defendant's conviction and sentences are affirmed.
AFFIRMED.
NOTES
[1] A secretor is a person who secretes his blood group typing substance into his body fluids.
[2] Mrs. Victim had previously identified Gladney from a photographic array and identified Hicks from an array presented to her on the same day that police officers visited her to show her the Prudholm array. Although it is likely that she was looking for someone who looked like Prudholm, the police did nothing to indicate that she should focus her attention on his photograph more than the others.