904 So.2d 881 (2005)
STATE of Louisiana
v.
Frederick L. CONDLEY, Kendrick Williams.
No. 04-KA-1349.
Court of Appeal of Louisiana, Fifth Circuit.
May 31, 2005.
*884 Paul D. Connick, Jr., District Attorney, Twenty-Fourth Judicial District, Parish of Jefferson, Terry M. Boudreaux, Anne Wallis, Donald A. Rowan, Jr., Assistant District Attorneys, Gretna, Louisiana, for Plaintiff/Appellee.
Holli Herrle-Castillo, Louisiana Appellate Project, Marrero, Louisiana, Jane L. Beebe, Louisiana Appellate Project, New Orleans, Louisiana, for Defendant/Appellant.
Kendrick Williams, In Proper Person, Angola, Louisiana.
Panel composed of Judges MARION F. EDWARDS, SUSAN M. CHEHARDY and CLARENCE E. McMANUS.
CLARENCE E. McMANUS, Judge.
Defendants, Frederick L. Condley and Kendrick Williams, appeal their convictions for second degree murder. For the reasons which follow, we affirm the convictions and remand the matter for correction of an error patent.

STATEMENT OF THE CASE
On November 6, 2003, the Jefferson Parish Grand Jury issued an indictment charging defendants, Frederick L. Condley and Kendrick Williams, with second degree murder in violation of LSA-R.S. 14:30.1. Defendants were arraigned and pled not guilty. Williams' motion to quash indictment and to sever defendants was denied on July 20, 2004.
The case was tried on July 20, 21, and 22, 2004 before a 12-person jury which found defendants guilty as charged. On September 3, 2004, the trial court sentenced defendants to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence.
On that same date, defendants' motions for new trial were denied, and Condley's motion for post verdict judgment of acquittal and motion to reconsider sentence were denied. Defendants filed motions for appeal that were granted.

FACTS
Joseph Washington, an eyewitness, testified that on September 8, 2003, between 8:30 and 9:30 p.m., he was coming from his friend's house on Rotunda Street in Avondale and going home. As he walked up Rotunda and turned onto Senate Street, he noticed that Eric Deverney, whom he knew as "Tiptoe", was being beaten in a *885 side yard by two men whom he later identified as defendants, Williams and Condley.
Washington observed Williams hitting Deverney hard all over his body with a post-hole digger and Condley hitting Deverney with a two-by-four. He explained that Williams then dropped the post hole digger and started hitting Deverney with a bat. Washington heard Deverney screaming, "[p]lease stop. Stop. All right. I'm sorry. I'm sorry." Washington watched the beating for three or four minutes until Williams came down to the curb where he was standing and told him, "[g]et the f ... from around here before something happens to you."
After that, Washington heard Williams tell Condley, "[g]o get the gauge", which Washington assumed meant a 12-gauge shotgun. At that point, Washington walked off, went down the street to the corner of Senate and Delegate Streets, hid behind a tree so defendants would not see him, and finished watching. Washington heard Deverney hollering and then observed defendants back up a white Pontiac or Grand Prix in the driveway and put Deverney's body into the trunk along with the post-hole digger, bat, and another shovel.
Afterwards, Washington saw defendants wash down the driveway. Washington left and walked around the corner back to his friend's house to ask him to take him to a telephone so he could call the police. Washington's friend subsequently took him to the Circle K where Washington dialed 911 and reported the incident.
After Washington and his friend left the Circle K, they went down Avondale Garden Road and then down a street near River Road. As they did so, Washington saw the white Pontiac coming across the train tracks with the trunk flopping up and down. Washington assumed that defendants had dropped the body off behind the levee. When defendants returned to the house, Washington saw them finish washing down the driveway. Washington testified that the police came to the scene, but did not do anything. Therefore, he called the police again and gave his name and told them what happened. Washington later positively identified Williams in a photographic lineup.
Lori Rimmer, an eyewitness, testified that on September 8, 2003 between 8:30 and 9:30 p.m., as she was walking up Senate Street towards Delegate to go visit a friend, she observed Deverney walk down the street to Williams' house. Rimmer then heard a verbal confrontation and saw Williams hit Deverney in the back with a shovel. Rimmer testified that as Deverney was hollering and screaming for his life and trying to get up, Condley hit Deverney with a hammer which knocked Deverney back down.
Rimmer observed both Williams and Condley stomp Deverney. She explained that a group of people present at the scene subsequently made a circle around defendants and Deverney, so she could not see any more of what was going on. After the beating, Rimmer observed defendants put the body into plastic, wrap it up tightly, and put the body inside the trunk of a white Grand Am which they had backed up to the garage area. Rimmer explained that they had to slam the trunk several times to get it to close. During the event, Rimmer saw Ricky Cowart standing by the fence near the driveway. Rimmer stayed out there until approximately 10:00 p.m. She saw the police come, but she did not talk to them because she was scared.
At some point after this incident occurred, Williams stopped her as she was walking and asked her if she knew anything about a murder. Rimmer told Williams she did not know what he was *886 talking about. Rimmer later positively identified Williams and Condley in photographic lineups and in court.
Ricky Cowart, an eyewitness, testified that on the evening of September 8, 2003, he and Deverney, a lifelong friend, intended to go and purchase drugs from Williams, whom he called "Black". Cowart explained that he was waiting for some money "to go half on some drugs", but that Deverney did not want to wait. Deverney then left, telling Cowart, "I'm gonna take care of my business." After Cowart got the money, he walked down to Williams' house, which was one house down from where Cowart was, to see what was going on.
As Cowart walked down alongside the fence, he saw Condley hit Deverney twice. He then observed a bunch of people pile onto Deverney and start beating him. Cowart also saw Williams hit Deverney from the back. He testified that Condley may have hit Deverney with a two-by-four, but he was not sure, and that Williams hit Deverney with a "pole digger."
Cowart eased back around to the other side of the house. He then observed defendants back up a white Pontiac in the driveway and put Deverney into the trunk. Coward heard the trunk slam several times and saw the vehicle leave and stay gone for a few minutes. He assumed they were going to take the body somewhere and dump it. When defendants finished with what they were doing, they came back to the scene. Cowart then observed 11 or 12 men get into the white Pontiac and a green car and leave.
The next morning, Cowart was on his way to the store when Williams called him over. When Cowart walked over there, he noticed defendants were putting bleach on the ground to clean up what they had done the night before. Cowart noted that defendants had also hosed down the driveway the night before. Williams asked Cowart if he had heard anything, and Cowart said he had not. Later on, Cowart went to the detective bureau to inform them of the incident. Cowart positively identified Williams and Condley in photographic lineups.
JPSO Det. David Morales testified that on September 11, 2003, Deverney's body was found in the 7200 block of River Road, 95 feet from the base of the levee near some weeds. He further testified that a piece of blue plastic was found on the ground five feet from the victim's head. Morales explained that the plastic was part of a lower trunk trim section of a General Motors vehicle, and that the part number on the plastic indicated it belonged to a 1999 Pontiac Grand Am. He showed photographic lineups to the eyewitnesses who positively identified defendants. Morales spoke to Williams who told him that on September 6, 2003 he had taken a 10:00 p.m. Southwest Airlines flight to Houston.
Dr. Karen Ross, a forensic pathologist and assistant coroner with the Jefferson Parish Coroner's Office and a stipulated expert in the field of forensic pathology, testified that she conducted an autopsy on Deverney. Her physical examination revealed that Deverney's body was decomposing, and that it had multiple blunt force injuries, multiple lacerations of the scalp with a skull fracture on the left side of the head, and lacerations on the upper part of the chest and on both of the arms and lower back. In her report, Dr. Ross stated that it was her opinion that Deverney died as a result of multiple blunt force injuries, and that the manner of death was homicide.
After the state rested, the defense called Crisceda Martin Williams, Williams' wife, as a witness. Mrs. Williams testified that on September 6, 2003, at approximately *887 11:15 p.m., she and her friend, Lawrence Rogers, picked up Williams from a Houston airport. She explained that she and Williams had decided to reunite after being separated since March of 2003, and that Williams had come to Houston to pick up her and their children and bring them back home to Avondale.
Mrs. Williams testified that she, Williams, and their children spent the night of September 6, 2003 in Houston, and that on September 7, 2003, they went to church with a friend, picked up a layaway item from Wal-Mart, and spent that night with friends. Mrs. Williams explained that on September 8, 2003, she and Williams went to their children's school in Houston and checked them out, went back to their friends' house, and then went to McDonalds at approximately 5:00 p.m. After they ate at McDonalds, they headed home to New Orleans making two stops along the way.
Mrs. Williams testified that Williams was with them all day on September 8, 2003, that she was not sure when they got home, that it was dark when they got home, that they did not get home before midnight, and that they did not get home until the next day, September 9, 2003.
Lawrence Rogers testified at trial, and his testimony largely corroborated that of Mrs. Williams. Additionally, Rogers testified that he saw Williams on September 8, 2003 at approximately 5:00 p.m. at McDonalds, that Williams left McDonalds and headed for New Orleans between 5:15 and 6:00 p.m., and that he did not see Williams again after that.
Defendant, Kendrick Williams, Condley's brother, testified at trial, and his testimony largely corroborated that of Mrs. Williams and Rogers. Additionally, Williams testified that he was not in Avondale on September 8, 2003 at 9:00 p.m., and that he did not know Deverney and never beat or hit or killed him. Williams recalled telling the police that he got home at 10:00 p.m., but said that he was not paying attention to what he was saying. He claimed he did not get home from Houston until Tuesday morning, September 9, 2003. Williams explained that he had previously called the police to lodge a complaint against Cowart for purchasing drugs in front of his house while his children were outside and suggested that Cowart had testified against him in retaliation.
The state called Lisa Stewart as a rebuttal witness. Stewart, Custodian of Records for Southwest Airlines, testified that there was no ticket issued to Kendrick Williams on September 6, 2003 leaving at 10:00 or 10:15 p.m. from New Orleans to Houston. On cross-examination, she testified that a ticket was issued in the name of "Willie Williams" on that date.
After hearing this testimony and considering the evidence, the jury found defendants guilty.

ASSIGNMENT OF ERROR NUMBER THREE BY KENDRICK WILLIAMS AND ASSIGNMENT OF ERROR NUMBER TWO BY FREDERICK L. CONDLEY
Williams' assignment of error number three and Condley's assignment of error number two will be addressed first because defendants assert issues on appeal that relate to both the sufficiency of evidence and one or more trial errors, including an error regarding the erroneous admission of evidence. When that is the case, the reviewing court should first determine the sufficiency of evidence by considering all of the evidence, including evidence the trial court may have erroneously admitted. State v. Hearold, 603 So.2d 731, 734 (La.1992); State v. Mayeux, 94-105 *888 (La.App. 5 Cir. 6/28/94), 639 So.2d 828, 834. If the appellate court determines that the evidence was insufficient, then defendant is entitled to an acquittal, and no further inquiry as to trial errors is necessary. However, if the appellate court finds that the totality of the evidence was sufficient to support defendant's conviction, it must then determine whether the trial court erred in admitting the questioned evidence and, if so, whether the trial court's error requires a reversal of the conviction or was harmless. State v. Alexis, 98-1145 (La.App. 5 Cir. 6/1/99), 738 So.2d 57, 64, writ denied, 99-1937 (La.10/13/00), 770 So.2d 339.
Defendant, Williams, argues that the trial court erred in denying his motion for new trial because the evidence was legally insufficient to support his conviction. Defendant, Condley, argues that the trial court erred in denying his motion for new trial and motion for post verdict judgment of acquittal because the evidence was legally insufficient to support his conviction. They contend that the state failed to prove beyond a reasonable doubt the identities of the perpetrators. They assert that the state's witnesses were convicted felons whose testimony was unreliable, incredible, and inconsistent with each other and with their statements to police.
The state responds that, viewing the totality of the evidence in the light most favorable to the state, the proof was sufficient to convince a rational factfinder, beyond a reasonable doubt, that defendants murdered the victim.
Both defendants filed motions for new trial based on LSA-C.Cr.P. art. 851(1) and (5), arguing that the verdict was contrary to the law and the evidence, and that the ends of justice could only be served by the granting of a new trial.
LSA-C.Cr.P. art. 851 provides in pertinent part:
The motion for a new trial is based on the supposition that injustice has been done the defendant, and, unless such is shown to have been the case the motion shall be denied, no matter upon what allegations it is grounded.
The court, on motion of the defendant, shall grant a new trial whenever:
(1) The verdict is contrary to the law and the evidence;
or (5) The court is of the opinion that the ends of justice would be served by the granting of a new trial, although the defendant may not be entitled to a new trial as a matter of strict legal right.
Defendant, Condley, also filed a motion for post verdict judgment of acquittal contending that the evidence was insufficient to support the conviction.
The question of sufficiency of evidence is properly raised in the trial court by a motion for post-verdict judgment of acquittal under LSA-C.Cr.P. art. 821. State v. Ellis, 95-1005 (La.App. 5 Cir. 3/26/96), 672 So.2d 1007, 1008 (citation omitted); State v. Gibbs, 03-967 (La.App. 5 Cir. 12/30/03), 864 So.2d 866, 874. Thus, Condley's assignment is properly before this Court.
With respect to the denial of the motions for new trial based on LSAC.Cr.P. art. 851(1), this Court in State v. Lyles, 03-141 (La.App. 5 Cir. 9/16/03), 858 So.2d 35, 50 stated in pertinent part (citations omitted):
The denial of a defendant's motion for new trial, based on LSA-C.Cr.P. art. 851(1), presents nothing for review on appeal. However, the Louisiana Supreme Court and this Court have addressed the constitutional issue of sufficiency of the evidence under such circumstances.
*889 Therefore, the sufficiency issue raised by Williams can be addressed by this Court as well.
With respect to the denial of the motions for new trial based on LSA-C.Cr.P. art. 851(5), this Court stated in State v. Terrick, 03-515 (La.App. 5 Cir. 9/30/03), 857 So.2d 1153, 1161, writ denied, 03-3272 (La.3/26/04), 871 So.2d 346 (footnote added):
Additionally, the Louisiana Supreme Court, in State v. Snyder, 750 So.2d at 860, at fn. 22,[1] stated the following regarding a motion for new trial grounded on an allegation under LSA-C.Cr.P. art. 851(5) that the ends of justice required the grant of a new trial: "It is settled that a judgment on these grounds (invariably denying the motion) is unreviewable by an appellate court, which may review the grant or denial only `for error of law.'" This error assignment presents nothing for our review.
In light of the foregoing, the denial of the motions for new trial based on LSA-C.Cr.P. art. 851(5) present nothing for this Court to review.
The constitutional standard for testing the sufficiency of the evidence, enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt.
In the instant case, defendants were convicted of second degree murder. To prove second degree murder, the state must show (1) the killing of a human being, and (2) that the defendant had the specific intent to kill or inflict great bodily harm. LSA-R.S. 14:30.1(A). Specific intent is "that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." LSA-R.S. 14:10(1). Specific intent may be inferred from the circumstances and actions of the accused as well as from the extent and severity of the victim's injuries. State v. Keating, 00-51 (La.App. 5 Cir. 10/19/00), 772 So.2d 740, 743, writ denied, 00-3150 (La.10/12/01), 799 So.2d 494.
In addition to proving the statutory elements of the charged offense at trial, the state is required to prove the identity of the perpetrator. Where the key issue is identification, the state is required to negate any reasonable probability of misidentification in order to carry its burden of proof. State v. Vasquez, 98-898 (La.App. 5 Cir. 2/10/99), 729 So.2d 65, 69.
In the instant case, defendants are correct that there were inconsistencies among the three witnesses regarding the number of people present during the beating, the type and number of weapons used, and whether the witnesses saw one another at the time of the beating, among other things. However, the witnesses were consistent on the most relevant aspects of the case, i.e., they all witnessed defendants beating the victim with objects on September 8, 2003 between 8:30 and 9:30 p.m., placing the body in the trunk of a white Pontiac or Grand Am, and driving away. Additionally, Washington testified that he observed a white Pontiac with its trunk flopping up and down returning from an area near River Road, and Det. Morales testified that a piece of plastic from a 1999 Pontiac Grand Am was found on the ground near the victim's body which was *890 discovered in the 7200 block of River Road.
Although defendant Williams claimed to be on his way home from Houston at the time of the incident, the jury apparently rejected this testimony and found the state's witnesses to be more credible. It is the role of the fact-finder to weigh the respective credibilities of the witnesses, and a reviewing court will not second-guess the credibility determinations of the trier of fact beyond the sufficiency evaluations under the Jackson standard of review. State ex rel. Graffagnino v. King, 436 So.2d 559 (La.1983).
Viewing the evidence in this case in the light most favorable to the prosecution, we find that the jury could have found beyond a reasonable doubt that defendants committed second degree murder.

ASSIGNMENT OF ERROR NUMBER ONE BY KENDRICK WILLIAMS
Defendant Williams argues that the trial court erred in denying the motion to quash the indictment and sever defendants for trial. He contends that the trial court's ruling prevented defendant, Condley, from testifying on his behalf.
The state responds that the trial court's ruling was proper because defendants' defenses were not antagonistic, because the substance of Condley's alleged testimony was provided by other witnesses, and because defendant could not show that Condley would even testify on his behalf should a severance be ordered.
On July 20, 2004, Williams' counsel argued that the matter should be severed so Condley could "possibly" testify that Williams was not present or even in town during the time of the homicide. The trial judge denied the motion without providing reasons.
LSA-C.Cr.P. art. 704 provides that jointly indicted defendants shall be tried jointly unless the state elects to try them separately, or the court, on motion of the defendant, and after contradictory hearing with the district attorney, is satisfied that justice requires a severance.
Whether justice requires a severance must be determined by the facts of each case. State v. Prudholm, 446 So.2d 729, 741 (La.1984); State v. Foret, 96-281 (La.App. 5 Cir. 11/14/96), 685 So.2d 210, 224. A defendant is not entitled to a severance as a matter of right, but the decision is one resting within the sound discretion of the trial court. Prudholm, 446 So.2d at 741; State v. Cedrington, 98-253 (La.App. 5 Cir. 12/16/98), 725 So.2d 565, 577, writs denied, 99-190 (La.6/4/99), 743 So.2d 1249 and 99-431 (La.6/25/99), 745 So.2d 1182. A denial of a motion to sever will not be overturned on appeal absent a clear abuse of discretion. Prudholm, 446 So.2d at 741; Cedrington, 725 So.2d at 577.
A severance is necessary if the defenses of the co-defendants are mutually antagonistic to the extent that one co-defendant attempts to blame the other, causing each defendant to defend against both his co-defendant and the state. Prudholm, 446 So.2d at 741; Cedrington, 725 So.2d at 577.
In State v. Turner, 365 So.2d 1352, 1354 (La.1978), cited by defendant in his brief, the supreme court stated in pertinent part:
Where it is clear from the record that a co-defendant would give exculpatory testimony if a severance were granted, the denial of a severance is an abuse of discretion. See, La.C.Cr.P. art. 704, Official Revision Comment (c)(2). However, the burden is on the movant to establish that the co-defendant would, in fact, testify at a separate trial, and *891 the exculpatory nature of his proposed testimony. See, 8 Moore's Federal Practice, s 14.04(4).
In the instant case, Williams failed to demonstrate that Condley would, in fact, testify at a separate trial or that Condley's testimony would exculpate him. Additionally, Mrs. Williams testified that Williams was with her traveling home from Houston at the time of the incident and, therefore, that he could not have committed the crime. As such, the substance of Condley's alleged testimony was presented to the jury. Accordingly, we find that Williams failed to show how he was prejudiced by the trial court's denial of the severance or that the trial judge's ruling amounted to an abuse of the trial judge's discretion.

ASSIGNMENT OF ERROR NUMBER TWO BY KENDRICK WILLIAMS AND ASSIGNMENT OF ERROR NUMBER ONE BY FREDERICK L. CONDLEY
Defendants argue that the trial court erred in admitting autopsy and crime scene photographs because they were gruesome, cumulative, and highly prejudicial. They contend that the autopsy photographs had no probative value because cause of death was not an issue, and that the crime scene photographs had no probative value because the location where the body was found was irrelevant to the murder. They assert that the photographs served no purpose other than to inflame the jury.
The state responds that the trial court's ruling was correct. It points out that the autopsy photographs were relevant to illustrate the number and location of wounds to the victim as well as the force used to inflict the injuries, and that the crime scene photographs were relevant because they corroborated the eyewitnesses' testimony that the body had been placed in a trunk and taken away. It notes that, although the photographs of the victim might be graphic, that the probative value outweighed any prejudicial effect.
During the direct examination of Dr. Karen Ross, the state began to show her State's Exhibits 4 through 16, the autopsy photographs, when defense counsel asked to approach the bench. Both defense counsel objected to the use of the photographs as being inflammatory and repetitive and argued that the probative value was far outweighed by the prejudicial effect. They pointed out that the photographs did not depict the body at the time of death, but several days later after it lay in the river.
The state responded that the jury had a right to see the injuries sustained and that the photographs depicted those injuries. The trial judge stated that a lot of them looked the same. The state indicated that there were originally 40 photographs, that he already had Dr. Ross go through them, and that the 13 remaining photographs showed either different injuries or different angles of the same injury. Defense counsel responded that they did not show the injuries sustained due to the decomposition and deterioration of the body. The trial judge stated that if Dr. Ross could explain the probative value of each of the photographs, then he would admit them into evidence.
Dr. Ross testified that the photographs showed what the injuries looked like, and she stated that the photographs would assist her in explaining the extent of the injuries. She further testified that the decompositional changes did not preclude her from identifying the injuries accurately enough to arrive at the cause and manner of death. Although she could not determine how many different objects were *892 used to beat the victim to death, she explained that the injuries could have been caused by shovels or hammers or two-by-fours.
Dr. Ross described the exhibits as follows: State's Exhibit 4 was a copy of the toe tag with decedent's name and date on it; State's Exhibit 5 was a view of decedent's face and upper chest showing some of the injuries on the scalp and the decompositional changes; State's Exhibit 6 was a view of the right side of the head and neck showing one of the injuries on the right side of the scalp and decompositional changes; State's Exhibit 7 showed a closer view and a different angle of that injury on the right side of the scalp (she noted that she could see the laceration more clearly in that photograph); State's Exhibit 8 was a view of the left side of the head with multiple lacerations on the left side of the head; State's Exhibit 9 was a view from the back of the head showing the fracture where parts of the skull were absent (she noted that that photograph was important because it showed a different angle and the extent of the lacerations and fracture); State's Exhibit 10 was a view of the neck with the head tilted backwards revealing the injury present beneath the right side of the jaw and the laceration on the right upper chest (she noted that this was a clearer and closer view of the laceration on the right upper chest); State's Exhibit 11 was a view of the ribcage and sternum showing hemorrhage over the fractures on the front of the ribcage; State's Exhibit 12 was a view looking from behind the ribcage showing hemorrhage with some of the associated fractures (she noted that State's Exhibits 11 and 12 gave her different angles to view the fractures that she normally could not see from one picture, and that it helped her in determining that these were anti-mortem fractures and not decompositional change); State's Exhibit 13 was a view of the left lower arm with two of the incise wounds or lacerations; State's Exhibit 14 was the lower right arm with the two injuries on the front of the right arm; State's Exhibit 15 was the upper part of the right lower arm with more of the sharp or blunt injuries (she noted that State's Exhibits 14 and 15 were both of the lower arm but showed two different injuries); and State's Exhibit 16 showed a cast that was present on the right lower leg at the time she received the body. Following Dr. Ross' description of the exhibits and testimony regarding their probative value, the trial judge allowed the photographs into evidence.
Later on during trial, Det. David Morales identified State's Exhibits 31 through 46 as crime scene photographs. Defense counsel objected to the photographs, arguing that they were inflammatory and repetitive. The trial judge commented that they were scene photographs. When defense counsel pointed out that they showed the decomposed body, the trial judge stated that that was the condition the body was in when they found it. The trial judge noted defense counsel's objections.
Det. Morales then testified that State's Exhibit 31 through 46 accurately depicted the scene as he found it. He pointed out that the photographs showed the body and the area near the river where the body was found. He did not describe the photographs individually, with the exception of State's Exhibits 40 and 41, which he explained showed the piece of plastic that was found near the body and that came from a 1999 Pontiac Grand Am.
The state is entitled to the moral force of its evidence and postmortem photographs of murder victims are admissible to prove corpus delicti, to corroborate other evidence establishing cause of death, location, placement of wounds, as well as to provide positive identification of *893 the victim. State v. Letulier, 97-1360 (La.7/8/98), 750 So.2d 784, 794-95; State v. Robertson, 97-0177 (La.3/4/98), 712 So.2d 8, 32, cert. denied, 525 U.S. 882, 119 S.Ct. 190, 142 L.Ed.2d 155 (1998); State v. Koon, 96-1208 (La.5/20/97), 704 So.2d 756, 776, cert. denied, 522 U.S. 1001, 118 S.Ct. 570, 139 L.Ed.2d 410 (1997); State v. Maxie, 93-2158 (La.4/10/95), 653 So.2d 526, 532. Photographic evidence will be admitted unless it is so gruesome as to over-whelm the jurors' reason and lead them to convict the defendant without sufficient evidence, i.e., when the prejudicial effect of the photographs substantially outweighs their probative value. State v. Perry, 502 So.2d 543, 558-59 (La.1986), cert. denied, 484 U.S. 872, 108 S.Ct. 205, 98 L.Ed.2d 156 (1987) (citations omitted). The admission of "gruesome photographs is not reversible error unless it is clear that their probative value is substantially outweighed by their prejudicial effect." State v. Broaden, 99-2124 (La.2/21/01), 780 So.2d 349, 364, cert. denied, 534 U.S. 884, 122 S.Ct. 192, 151 L.Ed.2d 135 (2001) (citing State v. Martin, 93-0285 (La.10/17/94), 645 So.2d 190, 198, cert. denied, 515 U.S. 1105, 115 S.Ct. 2252, 132 L.Ed.2d 260 (1995)).
In the instant case, we find that the autopsy photographs were relevant in showing the nature, location, and number of the victim's wounds, as well as the force necessary to inflict such wounds. The fact that 13 photographs were introduced is a direct result of the number of wounds and the various locations of the wounds. Although some of the photographs show the same body part, each photograph depicts a different angle or a closer and clearer view of the injury. The autopsy photographs also corroborate the testimony of the eyewitnesses that defendants beat the victim hard with tools and other objects. Additionally, the state relied on the photographs of the victim's wounds to aid Dr. Ross in explaining her findings to the jury.
The crime scene photographs showed different angles of the body and how the police found the body in relation to the surrounding landscape. Although the state did not, individually, introduce each photograph, we find that they tend to illustrate the testimony regarding the area and condition in which the police found the victim's body, and the piece of plastic linking the 1999 Pontiac Grand Am to the crime. They also corroborate the eyewitnesses' testimony that the body was placed into a trunk and taken away three days prior.
Although the autopsy and crime scene photographs at issue are gruesome, they were not so gruesome as to unfairly prejudice defendants' case.
In light of the foregoing, we find that the probative value of the photographs outweighs any prejudicial effect that might be had against defendants and, therefore, the trial court did not err in admitting the photographs into evidence.

ASSIGNMENT OF ERROR NUMBER ONE BY KENDRICK WILLIAMS (PRO SE)
Defendant Williams argues in his pro se brief that the trial court erred when it failed to comply with LSA-C.Cr.P. art. 811 relative to the receipt and recordation of the verdict. He contends that the jury's "guilty" verdict was unclear because it did not specify whether he was guilty of manslaughter or second degree murder. He notes that there is a conflict between the transcript and the minute entry, in that the transcript indicates defendant was found "guilty", but the minute entry reflects that he was found "guilty of second degree murder," and that the transcript should prevail.
*894 Prior to deliberations, the trial judge advised the jury that defendant was charged with second degree murder and that there were three responsive verdicts to the crime charged: guilty, guilty of manslaughter, and not guilty. The jury found both defendants "guilty." Following the verdict, defense counsel asked the trial judge, "[d]oes it say guilty of what, manslaughter or ." The trial judge advised him that the verdict for murder was either guilty, guilty of manslaughter, or not guilty.
Defense counsel accepted that explanation and moved to poll the jury. The trial judge then asked the jury to check "yes" or "no" in response to the question, "[i]s this your verdict?" Although the jurors were not individually polled on the record, the transcript indicates that the polling slips were counted, and that the trial judge stated, "[a]ll right, we have a legal verdict."
Condley's defense counsel asked the trial judge if they could ask the jury whether its verdict meant defendants were guilty of second degree murder or guilty as charged as opposed to just guilty. The trial judge stated that he did not have the verdict form, but that the responsive verdicts were guilty, guilty of manslaughter, or not guilty. Condley's defense counsel said he wanted to make sure the jury understood that. The trial judge responded that he was sure that they did.
LSA-C.Cr.P. art. 811 provides as follows:
If the verdict is correct in form and responsive to the indictment, the court shall order the clerk to receive the verdict, to read it to the jury, and to ask: "Is that your verdict?" If the jury answer "Yes," the court shall order the clerk to record the verdict and shall discharge the jury.
LSA-C.Cr.P. art 814 A(3) provides that the only responsive verdicts which may be rendered when the indictment charges second degree murder are: guilty, guilty of manslaughter, guilty of negligent homicide, or not guilty.
When responsive verdicts are mandated by LSA-C.Cr.P. art. 814, the trial court is without authority to vary or to add to those prescribed verdicts. State v. Simmons, 357 So.2d 517, 518 (La.1978); State v. Norman, 03-248 (La.App. 5 Cir. 5/28/03), 848 So.2d 91, 95, writs denied, 03-1934 (La.1/9/04), 862 So.2d 981, 03-1938 (La.1/9/04), 862 So.2d 982.
In light of LSA-C.Cr.P. art. 814 A(3), we find that the jury's verdict of "guilty" was responsive to the charge of second degree murder. As such, we find that the trial court did not err in the receipt and recordation of the verdict.

ASSIGNMENT OF ERROR NUMBER TWO BY KENDRICK WILLIAMS (PRO SE)
Defendant Williams argues in his pro se brief that the trial court erred in giving a defective charge on principals to the jury, and that the defense erred by not lodging an objection. He contends that the trial judge failed to charge the jury that in order to convict him of second degree murder, it must find that he had the specific intent to kill. He also contends that his trial counsel was ineffective for failing to object to the alleged error, and that his appellate counsel was ineffective for failing to assign and brief the alleged error.
The record reflects that the trial judge did in fact charge the jury that in order to convict defendants of second degree murder, it must find that defendants acted with a specific intent to kill or to inflict great bodily harm. This charge was read to the jury almost immediately after the *895 charge on principals. Additionally, the trial judge also provided the jury with the definition of specific intent.
In light of the foregoing, we find that the trial court did not err in giving an erroneous charge to the jury. Additionally, because the record shows that the jury instruction was proper, there was no basis for an objection by trial counsel. Thus, defendant's allegation regarding ineffective assistance of counsel has no merit.

ERROR PATENT DISCUSSION
The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990). The review reveals errors in this case.
First, the record does not contain the jury's written verdict, which apparently simply was not included in the record. However, "[t]here is no statutory or jurisprudential requirement that a written verdict be included in the record in a criminal case." State v. Clennon, 98-1370 (La.App. 5 Cir. 6/30/99), 738 So.2d 161, 165. Further, an omission from the record is not cause for reversal if that omission is immaterial to a proper determination of the appeal. State v. Brumfield, 96-2667 (La.10/20/98), 737 So.2d 660, 669, cert. denied, 526 U.S. 1025, 119 S.Ct. 1267, 143 L.Ed.2d 362 (1999). In State v. Champ, 01-434 (La.App. 5 Cir. 11/27/01), 803 So.2d 167, 171, this Court found that the omission of the written verdict was not material to a proper determination of the appeal, because the jurors were polled in open court and all twelve jurors stated that they had found the defendant guilty as charged.
In the instant case, as was stated previously, defense counsel moved to poll the jury. The trial judge then asked the jury to check "yes" or "no" in response to the question, "[i]s this your verdict?" Although the jurors were not individually polled on the record, the transcript indicates that the polling slips were counted, and that the trial judge stated, "[a]ll right, we have a legal verdict."
In light of the foregoing, we find that omission of the written verdict was not material to a proper determination of the appeal because the jurors were polled in open court and the trial judge stated that they had a legal verdict. As such, this error patent requires no corrective action. Champ, supra.
Second, the transcript indicates that the trial judge did not advise defendants of the two-year prescriptive period for filing an application for post-conviction relief, pursuant to LSA-C.Cr.P. art. 930.8. However, the commitments reflect otherwise. When there is a discrepancy between the minutes and the transcript, the transcript prevails. State v. Lynch, 441 So.2d 732, 734 (La.1983).
LSA-C.Cr.P. art. 930.8 provides that a defendant has two years from the date the judgment of conviction and sentence become final within which to file a post-conviction relief application. Therefore, we remand this matter to the district court with instructions to inform defendants of the proper provisions of LSA-C.Cr.P. art. 930.8 by sending appropriate written notice to defendants within ten days of the rendition of this opinion, and to file written proof in the record that defendants received the notice. State v. Hutchinson, 02-0060 (La.App. 5 Cir. 5/15/02), 817 So.2d 500, 509.
In accordance with the above, we affirm defendants' convictions and remand this matter for correction of the error patent.
CONVICTIONS AFFIRMED; MATTER REMANDED.
NOTES
[1] State v. Snyder, 98-1078 (La.4/14/99), 750 So.2d 832.