TERRI F. LOVE, Judge.
 

 1 j Defendants Justin Collins and Marion Taylor were jointly indicted for second-degree murder in the shooting death of Jerome Sparkman. Defendants were found guilty and sentenced to life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence. Defendants timely appeal.
 

 We find that the trial court did not err in allowing the testimony outside the presence of Defendants. We find that the evidence was sufficient to support Defendant Collins’ conviction. We find that the admission of the 911 recordings did not implicate the Confrontation Clause. Additionally, we find no merit in Defendant Taylor’s argument that the trial court erred in admitting evidence of firearms and ammunition. Nevertheless, we conclude that any error in their admission would be harmless.
 

 We further find that the trial court did not err in admitting Defendant Collins’ statement. We find that the trial court did not abuse its discretion in denying Defendant Taylor’s motion to sever. Lastly, we find no error in the trial court’s decision not to declare a Louisiana statutory scheme unconstitutional, and we conclude that even if the trial court erred, such error was harmless.
 

 ^PROCEDURAL HISTORY AND FACTS
 

 In 2008, the State jointly indicted Defendants Justin Collins and Marion “Little Daddy” Taylor (“Defendant Collins” and “Defendant Taylor”) for second-degree murder in the shooting death of Jerome Sparkman. Defendants pled not guilty and filed pre-trial motions, including motions to suppress evidence, statement, and identification, which were denied.
 

 Defendant Taylor filed a motion to sever his trial from that of his co-defendant, which the trial court denied. Defendant Taylor filed an application for supervisory writ in this Court, seeking review of the trial court’s denial of the motion to sever; this Court declined to exercise its supervisory jurisdiction.
 
 [1]
 
 Defendant Taylor then filed a writ of certiorari with the Louisiana
 
 *275
 
 Supreme Court, which was denied.
 
 [2]
 
 During trial, the motion to sever was renewed and denied.
 

 Defendant Taylor filed a motion to have Louisiana’s statutory scheme permitting non-unanimous jury verdicts in non-capital cases declared unconstitutional, and the trial court denied the motion. Defendant Taylor also filed three (3) motions in li-mine: 1) to exclude the statement made by Defendant Collins to the police; 2) to prevent the State from introducing evidence of firearms and ammunition found during the search of 2125 Annunciation Street; and, 3) to prohibit the State from introducing the 911 calls in this matter at trial. The trial court denied the motions.
 

 The State filed a motion to present the testimony of a child witness by closed-circuit television, which the trial court denied. The State applied for supervisory writ; this Court granted writ and ordered the trial court to conduct a hearing on the motion in accordance with La. R.S. 15:283.
 
 State v. Taylor,
 
 unpub. 2009-1157 (La.App. 4 Cir. 8/25/09). The trial court conducted that hearing, |3granted the motion, and allowed the witness’ testimony to be presented by closed-circuit television.
 

 At the conclusion of trial, the jury returned a verdict of guilty as charged as to both defendants. Thereafter, the trial court sentenced Defendant Taylor to life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence. Defendant Taylor moved for a reconsideration of the sentence, which was denied. Defendant Taylor appealed.
 

 Defendant Collins filed motions for post-verdict judgment of acquittal, new trial, and in arrest of judgment, all of which were denied. The trial court sentenced Defendant Collins to life imprisonment at hard labor without benefit of probation, parole or suspension of sentence. Defendant Collins moved for reconsideration of the sentence, which was denied. Defendant Collins appealed.
 

 In 2008, Dionne Sparkman (“Ms. Spark-man”) accompanied the victim (her brother, Jerome Sparkman) to a car wash. At approximately 12:15 p.m., the two left the car wash en route to the victim’s home, but the victim received a phone call that caused him to instruct Ms. Sparkman to drive to Juanita (“Peewee”) Davis’ house. Justin Collins (“Defendant Collins”) was seated on Peewee’s porch, and the victim exited the vehicle to speak to Defendant Collins. Ms. Sparkman could not hear the conversation between the victim and Defendant Collins, but stated that they spoke only briefly before she and the victim entered the house. Shortly thereafter, the victim went back onto the porch.
 

 Ms. Sparkman went onto the porch to call Peewee’s daughter to come inside. While on the porch, Ms. Sparkman noticed the victim talking to Defendant Taylor, Defendant Collins, and other friends that she did not recognize. While Ms. Spark-man recognized Defendant Taylor as one of the victim’s friends, she had only seen Defendant Collins for the first time on that day. After Peewee’s daughter entered the house, Ms. Sparkman went back into the house.
 

 |4Ms. Sparkman and the victim remained at Peewee’s house for approximately two hours. Approximately ten minutes before he was murdered, the victim entered the house to tell Peewee that someone at the front door wanted to speak to her. Ms. Sparkman observed that the victim was angry because he loaned Defendant Collins his vehicle (a white Impala) to drive to the store, and Defendant Collins had not yet returned with the vehicle. The victim
 
 *276
 
 spoke to Peewee again briefly and then left the house.
 

 Not long thereafter, someone from the neighborhood came to Peewee’s house and stated that the victim had been shot. Ms. Sparkman panicked when she heard the news and stayed in the house, worrying about how to tell their mother that the victim was dead. A few minutes thereafter, Ms. Sparkman ran from Peewee’s house to the intersection of Annunciation and Laurel Streets, where she found the victim dead in the driver’s seat of his white Impala.
 

 Ms. Sparkman later spoke to investigating detectives and identified photographs of Defendants Taylor and Collins as the men she last saw with the victim; she also made an in-court identification.
 

 Tawanka Sparkman (“Tawanka”) and the victim were married and had four children at the time of the victim’s death. The victim owned a carwash, and on the day of the murder, the victim left their home with his sister, Ms. Sparkman, and drove to his business in Algiers, Louisiana. On the day of his death, the victim was driving a white Impala. When the victim left Algiers, he telephoned Tawanka and stated that he and Ms. Sparkman were going to the Tchoupitoulas Street area to see his friend Marion “Little Daddy” Taylor. Tawanka called the victim thereafter and heard him arguing with someone; he told Tawanka that he would call her back. When he did so, she asked him if he was okay, and he replied that he was fine. Tawanka told the victim that she was going home and that she would call him | slater. That was the last conversation that Tawanka had with the victim. Ta-wanka later received a call from Ms. Sparkman telling her that the victim had been shot.
 

 Tawanka told the investigating detectives that the last time she spoke to the victim, he was with Defendant Taylor. Ta-wanka met with Detective Gernon and identified a picture of Defendant Taylor; she also identified Defendant Taylor in court as the man she knew as “Little Daddy.” Although the victim carried two cell phones — one for business, the other for personal use — the only items she retrieved from the coroner’s office were a cigarette lighter and some change.
 

 At the time of the incident, Ms. Andrea Taylor was an Assistant Police Communications Supervisor with the NOPD. Ms. Taylor was responsible for overseeing 911-call operations, and identified State’s exhibits twelve and thirteen as the incident recalls and audio recordings, respectively, of the 911 calls received in this case. One of the 911 calls gives the description of persons running from the scene; the next is someone yelling that someone had been shot; and, another reports an accident and that someone has been shot. All of the calls referenced a white vehicle in the area of Josephine and Laurel Streets.
 

 In accordance with La. R.S. 15:440.1
 
 et seq.,
 

 [3]
 

 D.T.l
 
 [4]
 
 testified that he lived in the neighborhood when the shooting occurred and would walk around the corner to buy
 
 *277
 
 candy from a store. On the date of the incident, D.T.l, his sister, D.T.2, and his cousin walked to the store. While walking, they observed a passing white vehicle containing three people — one person was in the driver’s seat, another man was seated next to him, and another man was in the back seat. As D.T.l was entering the store, he observed Defendant Taylor and Defendant Collins each shoot |fithe driver, and he heard two gunshots come from the vehicle. Thereafter, D.T.l observed Defendants, who he knew from the neighborhood, exit from the back of the white vehicle and run. D.T.l also observed Defendant Collins, who was sitting in the front passenger seat, getting into the back of the vehicle with Defendant Taylor; Defendants then exited the back of the vehicle.
 

 Defendants were armed with black guns when they exited the vehicle. D.T.l testified that the gun held by Defendant Collins was “big like an AK machinegun” and the other was “little,” like the kind police officers carry. As D.T.l ran from the scene, he observed Defendant Collins jump over a black fence; D.T.l ran home and told his mother what he observed. D.T.l spoke to Detectives Gernon and Williams and identified pictures of Defendants as the men he observed exiting the white vehicle. D.T.l identified pictures of Defendants Collins and Taylor and the shooting scene.
 

 Detective Nicholas Gernon responded to a call received involving a homicide at Laurel and Josephine Streets and led the investigation of the shooting death of Jerome Sparkman. When he arrived on the scene, Det. Gernon noted that the area was a residential neighborhood with a corner store and retirement community in close proximity. A white Impala, with the deceased victim sitting in the driver’s seat, had hit a blue truck. The Impala’s driver, front passenger, and left rear doors were open. Det. Gernon directed police personnel in photographing and collecting evidence from the scene, interviewing the victim’s family members and canvassing the neighborhood for potential witnesses. The police investigation indicated that the shooters were inside the vehicle when the victim was shot. While inspecting the white Impala, police recovered three cell phones from the vehicle. The police determined that two of the phones belonged to the victim and the third, a black Boost phone that was found on the floor of the front passenger seat, belonged to Defendant Collins.
 

 17Pet. Gernon spoke to Christopher Meis (“Mr. Meis”), who Det. Gernon learned was in the store when the shooting began. Mr. Meis ran outside of the store and saw two suspects fleeing from the white vehicle. Mr. Meis described the suspect who exited from the front passenger seat as approximately 5'7" tall with light skin complexion and the beginnings of a goatee and a fresh abrasion on his face. Mr. Meis also described the suspect in the rear driver’s side seat as approximately 5'10" tall, lighter skinned than the other suspect, with the beginning of twists in his hair. However, Mr. Meis could not identify either suspect from a photo lineup compiled by Det. Gernon.
 

 Det. Gernon then spoke to D.T.2, who stated that on her way to the store, she witnessed the shooting and the car accident that ensued. D.T.2 identified Defendant Collins from a photo lineup as the suspect who was seated in the front passenger seat at the time of the shooting. Det. Gernon also interviewed D.T.2’s younger brother, D.T.l, who accompanied her as she was en route to the store and also identified Defendant Collins as one of the shooters.
 

 
 *278
 
 Det. Gernon obtained an arrest warrant for Defendant Collins, and Defendant Collins’ mother turned him in to the police. After advising Defendant Collins and his mother of their rights, they agreed to be interviewed by Det. Gernon. Initially, Defendant Collins told Det. Gernon that he and Defendant Taylor were together on the day of the shooting. They went to Defendant Taylor’s Aunt Irene’s (“Irene”) house in the morning and then back and forth to Defendant Taylor’s mother’s house.
 

 Later that afternoon, they went to Peewee’s house, and the victim allowed Defendant Collins to use his vehicle for a trip to the store to buy cigarettes. That afternoon, he learned that the victim had been shot. During further questioning, Defendant Collins admitted that he was in the front passenger seat of the victim’s vehicle when the shooting occurred; however, Defendant Collins stated that a | sperson in the back seat shot the victim. Defendant Collins stated that he could not identify the shooter and that he ran from the shooting and stashed his bloody clothing at Irene’s house.
 

 The search of Irene’s house yielded the recovery of a fully loaded assault rifle from a crawl space in the garage; three boxes of ammunition for the rifle; a box of .45-caliber ammunition; a 9-millimeter handgun, which was stashed underneath the mattress in the master bedroom; 9-mil-limeter ammunition; and, magazines for the weapons. Fingerprint testing on the weapons and ammunition produced negative results. The 9-millimeter gun was registered to Irene and testing excluded it as the murder weapon.
 

 Continuing the investigation, Det. Ger-non compiled a photo lineup and presented it to D.T.l and D.T.2. D.T.l identified the picture of Defendant Taylor as the man he observed shooting the victim in the head, and D.T.2 recognized the picture of Defendant Taylor as the man she saw seated in the back of the white vehicle, who ran from the scene.
 

 After Det. Gernon retrieved the bullet recovered from the victim’s head during autopsy, he searched the victim’s vehicle again and located a spent bullet casing under the driver’s seat. He also discovered a Sprite can, a T-shirt, hat and water bottle. Testing of the objects revealed no fingerprints on the water bottle, and ham and fiber samples from the other objects were not able to be used. However, the Sprite can contained two fingerprints that were matched to Defendant Collins’ fingerprints. Det. Gernon obtained a search warrant for Defendant Taylor’s last known address, and that search produced Defendant Taylor’s social security card, birth certifícate, paperwork from traffic court, several boxes of shotgun shells and pictures of Defendant Taylor. However, information gleaned from the autopsy indicated that the victim was not killed by a shotgun.
 

 |c|New Orleans Police Department (NOPD) fingerprint analysis expert, Officer Joseph Jackson, analyzed fingerprints taken in the investigation of this case. No fingerprints were identified as belonging to Defendant Taylor, but one fingerprint tested positive as to Defendant Collins.
 

 Sergeant Byron Winbush, NOPD expert in ballistics and firearms identification, determined that the bullet retrieved during the victim’s autopsy was either a .38 caliber or a .357 Magnum caliber. Because there was no weapon retrieved during the investigation, Sgt. Winbush made his determination by measuring the base diameter of the bullet. However, when he compared the bullet to the bullet casing retrieved from the scene, he determined that the bullet jacket and the bullet were fired from the same weapon. Sgt.
 
 *279
 
 Winbush concluded that the bullet could not have been fired from a .38 caliber or 9-millimeter weapon.
 

 D.T.2, D.T.l’s older sister, lived with her family at the time of this shooting. When walking to the store on the date of the incident, as she turned the corner near the store, she saw Defendant Collins shoot a man seated in the driver’s seat of a white vehicle. In addition to the victim and Defendant Collins, D.T.2 saw Defendant Taylor seated in the back seat of the white vehicle, behind the victim. After the victim was shot, Defendants Collins and Taylor jumped from the vehicle and ran. D.T.2 observed a gun in Defendant Taylor’s hand and a gun in Defendant Collins’ hand. After the shooting, D.T.2, D.T.l and Melvin ran toward home. Melvin warned D.T.l and D.T.2 not to look back, but D.T.2 did. When D.T.2 arrived home, she told her mother what she had seen. Later that day, D.T.2 relayed what she had seen to Det. Gernon. The detective showed her a photo lineup from which she identified Defendant Collins as one of the shooters. A few days later, from another photo lineup, she identified Defendant Taylor as the other shooter. When D.T.2 initially spoke to the Det. Gernon, she told him that Defendant Taylor Imshot the victim because she was afraid of Defendant Collins. Later, however, she stated that both Defendants Collins and Taylor shot the victim.
 

 Dr. Samantha Huber, forensic pathologist for the Orleans Parish Coroner’s Office, performed the autopsy on the victim’s body. The victim suffered three gunshot wounds to the head and a bruise on the nose. One of the gunshot wounds was a close-contact wound to the right, back of his head. The area around the wound bore a muzzle imprint from the murder weapon, soot, and searing. That wound caused extensive brain damage. Two bullet fragments were retrieved from this wound. The second wound was to the left, back of the victim’s head. The shot traveled forward and exited the victim’s right cheek, causing extensive brain damage. The third wound was a shallow, penetrating injury to the victim’s hand. That wound was not through-and-through, and appeared as if the bullet ricocheted or had passed through something prior to entering the victim’s hand. Either of the head wounds would have been fatal and probably killed the victim almost instantly.
 

 During his testimony, Mr. Meis also explained that in 2008, he was a member of the Guardian Angels, a volunteer crime fighting organization. Mr. Meis exited the store when he heard a shot and a crash, and he noticed a white vehicle pushing a blue truck through the intersection. Mr. Meis saw children running and two men exit the vehicle and run down Laurel Street toward Jackson Avenue. He did not notice whether either man was armed when exiting the vehicle. Mr. Meis observed the victim in the vehicle, and, after determining that he needed medical assistance, Mr. Meis called 911.
 

 ERRORS PATENT
 

 A review for errors patent reveals there are none.
 

 CLOSED-CIRCUIT PRESENTATION OF TESTIMONY
 

 | nIn one of several assignments of error, Defendants argue that the trial court improperly allowed D.T.l to testify by closed-circuit television rather than in the court room.
 

 La. R.S. 15:283 provides, in pertinent part:
 

 A. On its own motion or on the motion of the attorney for any party, a court may order that the testimony of a
 
 *280
 
 protected person
 
 [5]
 
 who may have been a witness to or victim of a crime be taken in a room other than the courtroom and be simultaneously televised by closed circuit television to the court and jury, when the court makes a specific finding of necessity based upon both of the following:
 

 (1) Expert testimony that the child would be likely to suffer serious emotional distress if forced to give testimony in open court.
 

 (2) Expert testimony that, without such simultaneous televised testimony, the child cannot reasonably communicate his testimony to the court or jury.
 

 The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that “[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him.” This right provides “two types of protections for a criminal defendant: the right physically to face those who testify against him, and the right to conduct cross-examination.”
 
 Coy v. Iowa,
 
 487 U.S. 1012, 1017, 108 S.Ct. 2798, 2801, 101 L.Ed.2d 857 (1988). However, public policy considerations and necessities may take precedence over “face-to-face” confrontation.
 
 Maryland v. Craig,
 
 497 U.S. 836, 849, 110 S.Ct. 3157, 3165, 111 L.Ed.2d 666 (1990).
 

 In
 
 Maryland v. Craig, supra,
 
 the United States Supreme Court reviewed a Maryland statute that allowed a child abuse victim to testify by one-way closed circuit television where it was shown that the child witness would suffer serious emotional distress such that the child could not reasonably communicate.
 
 Craig,
 
 497 U.S. at 840-42. The Court held that if the state makes an adequate showing of necessity, the state’s interest in protecting child witnesses from the trauma of | ^testifying in a child abuse case is sufficiently important to justify the use of a special procedure that permits a child witness in such cases to testify at trial against a defendant in the absence of face-to-face confrontation with the defendant.
 
 Id.,
 
 497 U.S. at 855. According to the Court, although the Maryland statute, when invoked, prevented a child witness from seeing the defendant as he or she testified against the defendant at trial, the procedure preserved all of the other elements of the confrontation right: “The child witness must be competent to testify and must testify under oath; the defendant retains full opportunity for contemporaneous cross-examination; and the judge, jury, and defendant are able to view (albeit by video monitor) the demeanor (and body) of the witness as he or she testifies.”
 
 Id.,
 
 497 U.S. at 851. The
 
 Craig
 
 court noted that although it was aware of the many subtle effects face-to-face confrontation may have on an adversary criminal proceeding, the presence of these other elements of confrontation — oath, cross-examination, and observation of the witness’ demeanor — adequately ensures that the testimony is both reliable and subject to rigorous adversarial testing in a manner functionally equivalent to that accorded live, in-person testimony.
 
 Id.
 

 Further, in
 
 Craig,
 
 the Court stated that the requisite finding of necessity must be a case-specific one.
 
 Id.,
 
 497 U.S. at 855. The trial court must hear evidence and determine whether use of the one-way closed-circuit television procedure is necessary to protect the welfare of the particular child witness who seeks to testify.
 
 Id.
 
 The trial court must also find that the child witness would be traumatized, not by the courtroom generally, but by the pres
 
 *281
 
 ence of the defendant.
 
 Id.,
 
 497 U.S. at 856. Denial of face-to-face confrontation is not needed to further the state’s interest in protecting the child witness from trauma unless it is the presence of the defendant that causes the trauma.
 
 Id.
 
 Finally, the trial court must | iafind that the emotional distress suffered by the child witness in the presence of the defendant is more than
 
 de minimis, i.e.,
 
 more than mere nervousness, excitement or some reluctance to testify.
 
 Id.
 
 The Court concluded that, where necessary to protect a child witness from trauma that would be caused by testifying in the physical presence of the defendant, at least where such trauma would impair the child’s ability to communicate, the Confrontation Clause does not prohibit use of a procedure that, despite the absence of face-to-face confrontation, ensures the reliability of the evidence by subjecting it to rigorous adversarial testing and thereby preserves the essence of effective communication.
 
 Id.,
 
 497 U.S. at 857.
 

 In the matter
 
 sub judies,
 
 on the morning of trial, the State filed a motion to allow the closed-circuit presentation of the testimony of D.T.l under La. R.S. 15:288, arguing that D.T.l would likely suffer serious emotional distress and be unable to effectively communicate his testimony. In support of the motion, the State offered sworn letters from Drs. Richard Richoux and Rafael Salcedo, who interviewed D.T.l and opined that requiring D.T.l to testify live in the courtroom “would be extremely traumatic and stressful for him [and] would ... likely ... exacerbate what appeared to be pre-existing symptoms of a post-traumatic stress disorder.”
 

 Dr. Sarah Deland, accepted as an expert in the fields of general and forensic psychiatry, testified for the State that if D.T.l were required to testify in open court, he would likely suffer extreme emotional distress and be unable to reasonably communicate his testimony to the jury. Contesting Dr. Deland’s testimony, the defendants argue that the factors Dr. Deland gave in support of her opinion were generalities, none of which was sufficient to support the trial court’s finding that D.T.l would be able to testify if not in the defendants’ presence. Dr. Deland’s testimony regarding D.T.l’s ability to testify in the presence of 114Pefendants supported the trial judge’s finding. Dr. Deland testified in part as follows:
 

 [DIRECT EXAMINATION OF DR. DELAND]
 

 A. My findings were that overall I found [D.T.l] to be a ... fairly intelligent child. He did not present any overt symptom of ongoing mental illness. However, he was ... anxious about his situation.
 

 He was able to tell me his version of the events that he witnessed very clearly without any difficulty. However, when it came to talking about coming into court, he became very, very anxious. He pretty much completely shut down, started drawing, did not want to talk about it, talked about other things, got up and down out of his chair, asked to leave the room.
 

 And so based upon my ... observations [of his behavior], it was my opinion that it would cause him extreme emotional distress to come into open court.
 

 Q. And, in your opinion to believe if he were to testify in open court, would he be able to communicate with the court ... express what he experienced?
 

 A. I think that’s — I mean — in open court, I have my doubts about whether or not he would be able to do that. * * *
 

 [CROSS EXAMINATION]
 

 
 *282
 
 Q. Doctor, let me ask you something if you don’t mind. Anyone that’s called as a witness, who’s appearing for the first time, whether they’re 10 or 44, there’s a degree of anxiousness, nervousness?
 

 A. Yes, I’d agree with that. * * *
 

 Q. And there’s no obvious — you said [D.T.l] is intelligent?
 

 A. Yes.
 

 Q. And he recalled everything to you without any problem?
 

 A. That’s correct.
 

 Q. And you said that when you mentioned about going to court he showed some reluctance, as most witnesses do, is that correct?
 

 A. Well, I wouldn’t really say so much reluctance as extreme anxiety.
 

 | ,-Q. Now, how would you categorize extreme anxiety?
 

 A. Like I said, he pretty much — he had been talking to me fairly regularly before, when once that happened, he really just shut down, meaning he broke eye contact, he looked down and just started drawing. He started asking me about extraneous things like Sponge Bob or how do you spell Sponge Bob, things like that, getting up and down out of his chair, and then when I asked to talk to his Mom, he was very eager to leave. He asked, “So I can leave?”
 

 Q. And my problem is trying to understand that this natural fear — as a new attorney is fearing going to trial for the first time, or a witness being called no matter what the age, is very reluctant, and fearful, and has anxiety — that this is basically what he’s feeling right now because he’s never been in the courtroom. Would you agree with that?
 

 A. Yes.
 

 Q. ... it would cause him extreme emotional distress?
 

 A. Yes, it would.
 

 Q. Okay. And, in your opinion, would part of that be because he was placed in the same room with the defendants?
 

 A. I’m sure that has — yes. That has something to do with it. He is scared.
 

 Q. And you mentioned, when you started speaking about actually coming into the courtroom and testifying, he exhibited behavior such as shutting down, losing eye contact, going off topic. Would you expect that that would be his behavior if he were brought into court?
 

 A. Yes. That’s one of the things that I based my — based my opinion upon.
 

 Q. And that would cause him to not reasonably be able to communicate what he experienced?
 

 A. Yes.
 

 We find that Dr. Deland’s expert testimony conforms to the
 
 Maryland v. Craig,
 
 497 U.S. 836, 849, 110 S.Ct. 3157, 3165, 111 L.Ed.2d 666 (1990) standard that the emotional distress suffered by the child witness in this case in the presence of the defendant is more than
 
 de minimis, ie.,
 
 more than mere nervousness or | lñexcitement or some reluctance to testify. The trial court did not err in allowing D.T.l to testify outside the presence of the defendants.
 

 ADMISSION OF EVIDENCE
 

 ADMISSION OF 911 TAPES
 

 Defendants Collins and Taylor argue that the trial court erred in allowing the 911 tapes into evidence. Defendants contend that because the callers did not testify, and were thus not subjected to
 
 *283
 
 confrontation, Defendants’. Sixth Amendment rights were violated.
 

 In support of Defendants’ contention that their right to confront their accusers was violated, Defendants cite
 
 Crawford v. Washington,
 
 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), in which the U.S. Supreme Court found that certain ex parte examinations, while admissible under hearsay rules, are the type of testimonial evidence against the accused that the Confrontation Clause is supposed to prevent. The Supreme Court held that the Sixth Amendment bars admission of testimonial statements by a witness who did not appear at trial unless he was unavailable to testify, and the defendant had a prior opportunity to cross examine the witness.
 
 Id.
 
 In
 
 Davis v. Washington,
 
 547 U.S. 813, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), specifically in the context of 911 calls, the Supreme Court declared that “[statements are nontestimonial when made in the course of police investigation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency.” Conversely, statements are “testimonial when the circumstances objectively indicate that is no such ongoing emergency, and that the purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecutions.”
 
 Id.,
 
 547 U.S. at 822.
 

 In the matter before us, the 911 calls ranged from descriptions of suspicious persons running with guns to people reporting the shooting. Defendants | ^specifically object to the call from a caller identified only as “Tashia,” who identified Defendants Collins and Taylor by name and provided the path they were running.
 

 Applying
 
 Davis
 
 to the facts before us, we find that the 911 calls were non-testimonial and, therefore, the admission of the recording did not implicate the Confrontation Clause. The primary purpose of the callers’ statements and of the questioning by the 911 operator was to address and resolve an ongoing emergency. At the time the 911 calls were initiated, gunshots had been fired, and the callers feared for their safety and the safety of others. The questions posed by the operator were necessary to evaluate the situation, locate the perpetrators and to dispatch the required assistance.
 

 ADMISSION OF FIREARMS AND AMMUNITION
 

 Defendants argue that the trial court erred in admitting firearms and ammunition that were unrelated to the offenses charged in the indictment into evidence. Pursuant to search warrants issued in this case, the police confiscated guns and weapons from Defendant Taylor’s home on Annunciation Street and from his Aunt Irene’s house, where Defendants were seen running to with guns after the shooting. However, ballistics testing indicated that the guns and ammunition seized were not used to commit the murder. Defendants argue, therefore, the weaponry had no probative value and was introduced simply to prejudice Defendants by painting them as dangerous, armed persons.
 

 Defendants cite several cases in support of their argument that it is error to admit a weapon into evidence when the weapon was not the weapon used in the commission of the offense. However, we do not find support for Defendants’ argument therein.
 

 In
 
 State v. Manieri,
 
 378 So.2d 931 (La. 1979), the trial court admitted into evidence three knives which were “similar” to the murder weapon but which were 11snot used in the slaying. The Supreme Court held that the trial court erred in admitting
 
 *284
 
 the knives into evidence.
 
 Id.,
 
 378 So.2d at 933. However, such error was harmless because no effort was made to connect the knives to the crime or to the defendant, and a State witness testified that the knives were not the murder weapon.
 
 Id.
 

 In
 
 State v. Landry,
 
 388 So.2d 699 (La. 1980), the trial court admitted into evidence a pocketknife found on the defendant when he was arrested for a stabbing death. The Supreme Court found that the trial court erred in admitting the knife into evidence.
 
 Id.,
 
 388 So.2d at 704. However, because the State made no attempt to connect the knife with the killing or exploit the admission of the knife in argument, the Court held that the error was not reversible.
 
 Id.
 

 In
 
 State v. Villavicencio,
 
 528 So.2d 215 (La.App. 4 Cir.1988), the trial court admitted a .22 caliber rifle and bullets, .357 caliber bullets, and photographs of the defendant’s car showing these items in the interior of the vehicle. The defendant was charged with shooting the victim with a handgun.
 
 Id.,
 
 528 So.2d at 216. This Court found that the trial court erred in admitting the evidence because it was prejudicial, citing
 
 Manieri,
 
 but did not specifically find that the prejudicial effect outweighed any probative value of the evidence.
 
 Id.,
 
 528 So.2d at 217. This Court went on to find no reversible error because the State had not attempted to link the rifle and the .22 caliber bullets with the shooting.
 
 Id.
 
 No statement regarding any argument by the State concerning such evidence was made.
 

 In
 
 State v. Richardson,
 
 96-2598 (La. App. 4 Cir. 12/17/97), 703 So.2d 1371, the trial court allowed the introduction of a shotgun found abandoned by defendant in an incident unrelated to the armed robbery, committed with a handgun, for which he was being tried. This Court found no reversible error, in part, because the victim and a police officer testified that the shotgun had not been used in the robbery.
 
 Id.,
 
 96-2598 at p. 6, 703 So.2d at 1374.
 

 Lain this case, the investigating officer and the State’s ballistics expert both testified that none of the guns introduced into evidence was the murder weapon, and no effort was made by the State to connect the guns to the murder or exploit the admission of the guns in argument. While the weapons were not used in the murder, one of the guns matched the description provided by an eyewitness of the gun that was observed in the possession of one of the defendants at the scene. Additionally, admission of the weapons was relevant to claims made by defendants during trial of an incomplete police investigation. Thus, we find no merit in Defendant’s assignment of error, and we conclude that any error in their admission would be harmless.
 

 SUFFICIENCY OF EVIDENCE
 

 Defendant Collins argues that the evidence is insufficient to support his conviction. He contends that the evidence did not preclude the possibility of misidentifi-cation.
 

 The standard of appellate review for sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the State proved the essential elements of the crime beyond a reasonable doubt.
 
 Jackson v. Virginia,
 
 443 U.S. 307, 318, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The reviewing court is to consider the record as a whole, not just the evidence favorable to the prosecution; and, if rational triers of fact could disagree as to the interpretation of the evidence, the rational decision to convict will be upheld.
 
 State v. Mussall,
 
 523 So.2d 1305, 1310 (La.1988).
 

 
 *285
 
 Either direct or circumstantial evidence may prove the essential elements of the crime. With circumstantial evidence the rule is: “assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.” La. R.S. 15:488. This rule is not a separate test from the review standard established by
 
 Jackson v. Virginia,
 
 but rather it is an 12oevidentiary guideline which facilitates appellate review of the sufficiency of the evidence.
 
 State v. Jacobs,
 
 504 So.2d 817, 820 (La.1987). Ultimately, to support a conviction, the evidence, whether direct or circumstantial or both, must be sufficient under
 
 Jackson
 
 to satisfy any rational trier of fact that the defendant is guilty beyond a reasonable doubt.
 
 State v. Sutton,
 
 486 So.2d 471, 474 (La.1983). Credibility determinations are within the discretion of the trier of fact and will not be disturbed unless clearly contrary to the evidence.
 
 State v. Vessell,
 
 450 So.2d 938, 943 (La. 1984). In cases involving a defendant’s claim that he was not the person who committed the crime, the
 
 Jackson
 
 rationale requires the State to negate any reasonable possibility of misidentification in order to carry its burden of proof.
 
 State v. Varnado,
 
 1997-2825 (La.App. 4 Cir. 9/22/99), 753 So.2d 850, 857.
 

 To determine if there is a likelihood of misidentification, the jurisprudence has applied the following five-factor test enunciated in
 
 Manson v. Brathwaite,
 
 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977): (1) the opportunity of the -witness to view the assailant at the time of the crime; (2) the witness’ degree of attention; (3) the accuracy of the witness’ prior description of the assailant; (4) the level of certainty demonstrated by the witness; and (5) the length of time between the crime and the confrontation.
 
 State v. Jones,
 
 2002-1171 (La.App. 4 Cir. 6/26/02), 822 So.2d 205, 213
 
 (citing Manson, supra).
 

 Applying the
 
 Manson
 
 factors to this case, we find support for the reliability of the identification. D.T.l testified that he recognized Defendants Collins and Taylor from the neighborhood, stating that he saw them almost every day. D.T.l stated that he observed Defendant Collins in the victim’s car prior to the shooting, and then after the gun shots were fired, D.T.l stated he observed Defendant Collins exit the rear of the victim’s vehicle. D.T.l also stated that he and Defendant Collins ran in the same direction after the shooting, in close enough proximity to run past Defendant Collins as he (Defendant Collins) jumped a gate in the area. 1 ⅞1When presented with a photo lineup the day of the shooting, D.T.l identified Defendant Collins’ picture as one of the shooters.
 

 D.T.l’s older sister, D.T.2, also identified Defendant Collins as one of the men who shot the victim. Sgt. Gernon interviewed D.T.2 approximately three hours after the shooting, and she identified Defendant Collins’ picture from a photo lineup as one of the men who jumped from the victim’s vehicle after the shooting. Moreover, in his statement to the police, Defendant Collins stated that he was seated in the victim’s car in the front passenger seat at the time the victim was shot.
 

 RIGHT TO CONFRONT WITNESSES
 

 Defendant Taylor maintains the trial court erred in admitting the statement given by his co-defendant into evidence. Defendant Taylor maintains that his Sixth Amendment right to confront witnesses against him was violated by the trial court’s action and cites
 
 Bruton v. United States,
 
 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), as authority.
 

 The Confrontation Clause of the Sixth Amendment guarantees the right of a criminal defendant “to be confronted with
 
 *286
 
 the witnesses against him.” The United States Supreme Court has held that this guarantee, which is extended to the States by the Fourteenth Amendment, includes the right to cross-examine witnesses.
 
 Cruz v. New York,
 
 481 U.S. 186, 189, 107 S.Ct. 1714, 95 L.Ed.2d 162 (1987).
 

 The Supreme Court held in
 
 Bin-ton, supra,
 
 that in a trial where two or more defendants are tried jointly, the admission of a non-testifying co-defendant’s confession that expressly implicates the defendant violates the defendant’s Sixth Amendment confrontation rights, even if the district court gave the jury limiting instructions to consider the confession only against the codefendant who confessed.
 
 Bruton,
 
 391 U.S. at 126, 88 S.Ct. 1620;
 
 United States v. Melina,
 
 101 F.3d 567 (8th Cir.1996);
 
 United States v. Escobar,
 
 50 F.3d 1414, 1422 (8th Cir.1995). “If a code-fendant’s confession does not incriminate the defendant on its face, but does so 122only when linked to additional evidence, it may be admitted if a limiting instruction is given to the jury and the defendant’s name is redacted from the confession.”
 
 United States v. Flaherty,
 
 76 F.3d 967, 972 (citing
 
 Richardson v. Marsh,
 
 481 U.S. 200, 211, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987)). In addition,
 
 Bruton
 
 does not apply at all when a co-defendant’s statements do not incriminate the defendant either on their face or when considered with other evidence.
 
 Escobar,
 
 50 F.3d at 1422. See also
 
 State v. Brooks,
 
 98-0693 (La.App. 4 Cir. 7/21/99), 758 So.2d 814. In
 
 Bruton,
 
 the codefendant’s confession expressly implicated the defendant as his accomplice. 391 U.S. at 141-142, 88 S.Ct. 1620.
 

 Defendant Collins’ statement in this case was that he [Defendant Collins] was present in the automobile at the time of the shooting; the victim was driving; he [Defendant Collins] was in the front passenger seat; and that the person sitting in the rear driver seat of the vehicle shot the victim in the head.
 

 Bruton
 
 is not applicable in this case because Defendant Collins’ statement does not implicate Defendant Taylor in any wrong-doing. Nowhere in Defendant Collins’ statement does he identify Defendant Taylor as the shooter, nor does Defendant Collins’ statement indicate that Defendant Taylor was in the vehicle at the time of the shooting.
 

 In his statement, Defendant Collins specifically denied knowing who was in the back seat because he did not get a good look. Given the close relationship between Defendants Collins and Taylor as reflected in the statement (i.e., according to the statement, Defendants Collins and Taylor spent the night prior to the incident and most of the day of the incident together, and Defendant Collins referred to Defendant Taylor’s aunt, Irene, as his own aunt), the fact that Defendant Collins says in his statement that he did not recognize the back seat passenger would indicate that Defendant Taylor was not in the car at the time of the shooting. Therefore, we do not find that Defendant Taylor’s Sixth Amendment^right to confront witnesses against him was violated by the trial court’s admission of Defendant Collins’ statement. We find no error in the trial court’s admission of the statement.
 

 MOTION TO SEVER
 

 Defendant Taylor argues that the trial coui’t erred in denying his motion to sever his trial from that of Defendant Collins. While Defendant Taylor does not argue that his and Defendant Collins’ defenses are antagonistic, Defendant Taylor asserts that their defenses are “not sympathetic.”
 

 La.C.Cr.P. art. 704 provides that jointly indicted defendants shall be tried jointly
 
 *287
 
 unless the state elects to try them separately, or the court, on motion of the defendant, and after contradictory hearing with the district attorney, is satisfied that justice requires a severance.
 

 Whether justice requires a severance must be determined by the facts of each case.
 
 State v. Prudholm,
 
 446 So.2d 729, 741 (La.1984). A defendant is not entitled to a severance as a matter of right, but the decision is one resting within the sound discretion of the trial court.
 
 Prudholm,
 
 446 So.2d at 741. A denial of a motion to sever will not be overturned on appeal absent a clear abuse of discretion.
 
 Prudholm,
 
 446 So.2d at 741.
 

 A severance is necessary if the defenses of the co-defendants are mutually antagonistic to the extent that one co-defendant attempts to blame the other, causing each defendant to defend against both his co-defendant and the State.
 
 Prudholm,
 
 446 So.2d at 741. The defendant bears the burden of proof in such a motion. Mere unsupported allegation that defenses will be antagonistic is not sufficient to require a severance.
 
 Prudholm,
 
 446 So.2d at 741. Furthermore, the fact that each defendant has pointed a finger at the other does not make defenses automatically antagonistic. Prejudice must be shown if defendants are to receive separate trials.
 
 State v. Williams,
 
 416 So.2d 914, 916 (La. 1982).
 

 |24⅛ the case before us, both defendants denied any involvement in the shooting, but neither blamed the other for the offense. Nevertheless, Defendant Taylor argues that justice required a severance because he was blamed indirectly by Defendant Collins in his statement.
 

 In
 
 State v. Coe,
 
 the defendant was not entitled to severance from his codefendant in a second-degree murder prosecution where defendant’s statement was that he was with the co-defendant for the entire day, but the co-defendant’s testimony and statement differed by suggesting that at the time the incident occurred, the co-defendant was not with the defendant but was at her parent’s house without him. 2009-1012, p. 14 (La.App. 5 Cir. 5/11/10), 40 So.3d 293, 302.
 

 As we stated in the preceding assignment of error, Defendant Collins’ statement did not, directly or indirectly, implicate Defendant Taylor in the shooting. Therefore, we do not find that the trial court abused its discretion in denying Defendant Taylor’s motion to sever.
 

 MOTION TO HAVE STATUTE DECLARED UNCONSTITUTIONAL
 

 Defendant Taylor contends that the trial court erred in denying his motion to have Louisiana’s statutory scheme which permits non-unanimous jury verdicts in non-capital felony cases declared unconstitutional. In particular, he claims that Louisiana Article 1, § 17(A) and La.C.Cr.P. art. 782(A) violate the Sixth Amendment right to trial by jury in combination with the Fourteenth Amendment due process right.
 

 Louisiana Constitution Article I, § 17(A) provides that a case “in which the punishment is necessarily confinement at hard labor shall be tried before a jury of twelve persons, ten of whom must concur to render a verdict.” Additionally, La.C.Cr.P. art. 782(A) provides in part that “[c]ases in which punishment isj^necessarily confinement at hard labor shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict.”
 

 In
 
 Apodaca v. Oregon,
 
 406 U.S. 404, 410-11, 92 S.Ct. 1628, 1632-33, 32 L.Ed.2d 184 (1972) the United States Supreme Court stated:
 

 
 *288
 
 [T]he purpose of trial by jury is to prevent oppression by the Government by providing a ‘safeguard against the corrupt or overzealous prosecutor and against the complaint, biased, or eccentric judge.’
 
 Duncan v. Louisiana,
 
 391 U.S. 145 at 156, 88 S.Ct. 1444 at 1451, 20 L.Ed.2d 491 (1968) ... ‘Given this purpose, the essential feature of a jury obviously lies in the interposition between the accused and his accuser of the commonsense judgment of a group of laymen ... ’
 
 Williams v. Florida, supra,
 
 399 U.S. 78 at 100, 90 S.Ct. 1898 at 1906, 26 L.Ed.2d 446 (1970).
 
 A requirement of unanimity, however, does not materially contribute to the exercise of this commonsense judgment.
 
 As we said in
 
 Williams,
 
 a jury will come to such a judgment as long as it consists of a group of laymen representative of a cross section of the community who have the duty and the opportunity to deliberate, free from outside attempts at intimidation, on the question of a defendant’s guilt. In terms of this function we perceive no difference between juries required to act unanimously and those permitted to convict or acquit by votes of 10 to two or 11 to one. Requiring unanimity would obviously produce hung juries in some situations where non-unanimous juries will convict or acquit. But in either case, the interest of the defendant in having the judgment of his peers interposed between himself and the officers of the State who prosecute and judge him is equally well served, (emphasis supplied).
 

 In
 
 State v. Boudreaux,
 
 2008-1504, pp. 38-39 (La.App. 4 Cir. 9/29/10), 48 So.3d 1144, 1165, this Court noted:
 

 In
 
 State v. Bertrand,
 
 2008-2215 (La.3/17/09), 6 So.3d 738, the trial court found that La.C.Cr.P. art. 782(A) violated the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, relative to the number of jurors needed to concur to render a verdict in cases in which punishment is necessarily confinement at hard labor, the same issue raised by the defendant in the instant case. On direct appeal by the State, the Louisiana Supreme Court reversed, stating in its conclusion:
 

 Due to this Court’s prior determinations that Article 782 withstands constitutional scrutiny, and because we are not presumptuous enough to suppose, upon mere speculation, that the United States Supreme Court’s still valid determination that non-unanimous 12 person jury verdicts are constitutional may someday be overturned, we find that the trial court erred in ruling that Article 782 | ¡^violated the Fifth, Sixth, and Fourteenth Amendments. With respect to that ruling, it should go without saying that a trial judge is not at liberty to ignore the controlling jurisprudence of superior courts.
 
 Bertrand,
 
 2008-2215, p. 8, 6 So.3d at 743.
 

 This Court cited and relied on
 
 Bertrand
 
 in
 
 State v. Barbour,
 
 2009-1258 (La.App. 4 Cir. 3/24/10), 35 So.3d 1142, to reject the argument that the trial court had erred in denying the defendant’s motion to declare La. C.Cr.P. art. 782(A) unconstitutional as violative of the Fifth, Sixth and Fourteenth Amendments to the U.S. Constitution.
 

 As stated by the Louisiana Supreme Court in
 
 Bertrand,
 
 under current jurisprudence from the U.S. Supreme Court, non-unanimous twelve-person jury verdicts are constitutional, and La.C.Cr.P. art. 782(A) is constitutional.
 

 Accordingly, we find no merit in Defendant Taylor’s assignment of error. Fur
 
 *289
 
 ther, even if the trial court erred in failing to declare Louisiana’s jury statutory scheme unconstitutional, we find that such error was harmless because the jury verdict against Defendant Taylor was unanimous.
 

 DECREE
 

 Defendants’ convictions and sentences are affirmed.
 

 CONVICTIONS AFFIRMED; SENTENCES AFFIRMED
 

 [1]
 

 .
 
 State of Louisiana v. Marion Taylor,
 
 unpub., 2009-1035 (La.App. 4 Cir. 8/26/09).
 

 [2]
 

 .
 
 State of Louisiana v. Marion Taylor.,
 
 2009-1837 (La.8/12/09), 15 So.3d 1007.
 

 [3]
 

 . This witness’ testimony was taken in the judge's chambers in the presence of both defense counsels, the prosecutors and the judge and simultaneously broadcast via closed circuit television for the jury and the defendants seated in the court room.
 

 [4]
 

 . Two witnesses are juveniles, and rather than their full names, their initials are used throughout this opinion. However, the initials of both witnesses are "D.T.”, therefore, "D.T.l,” is used in this opinion for the male juvenile, who was eight-years-old at the time of the incident, and "D.T.2” is used for his female sister, who was eleven-years-old at the time of the incident.
 

 [5]
 

 . A "protected person” includes a person under the age of seventeen years who is a witness in a criminal prosecution. See La. R.S. 15:283(E)(1).