MARVIN, Judge.
On August 15, 1985, we ordered the record of the applicant’s PCR hearing lodged in this court for supervisory review. Having reviewed that record and the record of the applicant’s conviction, affirmed here in State v. Beverly, 448 So.2d 792 (La.App.2d Cir.1984), writ refused, we now affirm the trial court’s denial of post conviction relief.
*1028 Beverly alleges he was denied effective assistance of counsel because his trial lawyer
—told him his confession would not be used against him
—did not substantiate his alibi
—did not pursue an insanity defense
—did not relay to him an offer by the State to “plea bargain,” and
—did not properly and forcefully present his arguments on appeal.
Evaluation of effective assistance inquires whether counsel violated a duty to the client, and, if so, whether the violation resulted in prejudice to the client. State v. Berry, 430 So.2d 1005 (La.1983).
The trial court considered in great detail each contention of this applicant. We adopt the trial court’s reasons, which we attach as an appendix to this opinion, and affirm the trial court’s judgment.
AFFIRMED.
APPENDIX
RULING ON PETITIONS FOR POST-CONVICTION RELIEF
A bill of information filed December 21, 1978, charged petitioner with eight counts of simple burglary of an inhabited dwelling. Upon his plea of indigency, he was provided with a court-appointed attorney, Mr. J. Randolph Smith of Monroe. His counsel filed a bevy of motions, among which were for preliminary examination and the appointment of a sanity commission.
At the preliminary examination, the judge found probable cause on seven counts, but discharged petitioner from bail on an eighth count. On March 8 or 9,1979, he escaped from the Ouachita Parish jail and fled the state. He was later apprehended in Oregon, where he waived extradition to California. He was returned to that state, where he had escaped from a penal institution in 1978. Extradition proceedings begun here in July, 1979, were unsuccessful; but in November, 1981, California notified local authorities that petitioner was nearing release from incarceration there, and new extradition proceedings were begun. He was returned to this jurisdiction in January, 1982.
Previously appointed counsel, Mr, Smith, was relieved. Mr. Clyde Lain was appointed; and he filed a motion to quash the bill for failure to prosecute for more than two years. That motion was denied and application for writs was denied by our Supreme Court. He was ultimately tried by a jury in a four-day trial beginning February 28, 1983, and found guilty on all three counts presented by the prosecution. (The remaining four counts of the original bill were dismissed by the prosecution because of witness and evidence problems.)
He was sentenced on April 4,1983, to ten years at hard labor on each count, to be executed consecutively. The conviction and sentence were affirmed on appeal. State v. Beverly, 448 So.2d 792.
During the whole period of his incarceration here before being transferred to serve his sentences, petitioner bombarded the Clerk and the Court with letters and filings presented in proper person. Since his conviction, he has done the same from prison. Among those filings were a voluminous petition for post-conviction relief filed July 13,1984, in which he alleged many so-called errors and asserted a demand for new trial on newly-discovered evidence. That petition was denied in a written order filed July 17.
On August 16, 1984, he filed another lengthy petition in which he re-asserted most of the claims set out in the July petition and also complained that his alternative motion for new trial had not been directly decided. That petition was denied for the same reasons as the July petition had been, and this Court specifically denied the motion for new trial because it was untimely and affirmatively showed by its allegations that the so-called “evidence” was not newly-discovered.
He then sought appellate relief, and by order entered December 6, 1984, the Court of Appeal for the Second Circuit ordered *1029 this Court to appoint counsel for petitioner and to hold an evidentiary hearing on the claims of ineffective assistance of counsel as set forth in the petitions filed here on July 13 and August 16. Petitioner was brought back from the penitentiary and the hearing was held on February 27 after at least one continuance for the benefit of petitioner’s counsel.
The claims of ineffective counsel range from pre-trial to appellate activities and, of course, involve wholesale “second-guessing” by petitioner. Some of the claims are belied by the record; others have no relationship to the fundamental issue of guilt. For discussion, the claims are categorized as set forth hereafter.
MENTAL INCAPACITY
A motion for appointment of a sanity commission and to change the plea to include “not guilty by reason of insanity” was filed in 1979 before petitioner’s escape. All pending pre-trial motions were later waived by Mr. Lain in connection with efforts to obtain release without bail or an early trial. The present second-guessing complains that the “sanity” motion was never heard and should not have been waived.
The original motion alleged that at the time of the offenses and arrest here, petitioner was “an escapee from a California mental institution within the California Department of Corrections and/or had an extensive background of mental problems.” It also alleged he had “a long history of mental institutionalization.”
The post-conviction petitions allege that when arrested here in 1979, he was a recent escapee from a “mental hospital” and that his subsequent behavior should have alerted counsel and the court that there was a “likely mental status at the time of the offense” and “likelihood of abilities to assist in trial.” Hence, he concludes that his counsel’s failure to require hearing and ruling on the motion impaired his defense of the charges.
Petitioner has asserted no real evidence of mental incapacity, nor has he manifested any such symptoms. His trial counsel testified he never claimed to be incapable of distinguishing between right and wrong or being unable to understand the charges or assist counsel. To the contrary, he did in fact assist counsel, thoroughly thought out every conceivable avenue of defense and avoidance of consequences. His frequent ingenious and often lengthy pro se filings from the date of his arrest to the present manifest full intelligence, studious analysis and an incredible cunning in finding, researching and presenting “gimmicks” to belabor the system. The attorney made a sound judgment in determining that he had no appreciable basis for the motion and in not forcing it to adjudication. This Court has read volumes of petitioner’s writings and filings and observed him closely and carefully over a period of months during hearings and trials. As shown hereafter, his confession reveals he knew exactly what he was doing at the time of the offenses, notwithstanding his claim of intoxication, and with no reference to mental incapacity. This Court has not the slightest qualms about his mental status.
GENERAL PRE-TRIAL PREPARATION
Petitioner second-guesses his counsel as to nearly every aspect of trial preparation and trial activity. Most of the motions which he claims were not heard or not vigorously contested (or even re-urged after adverse rulings) had little or no relation to guilt or innocence, or were rendered moot by subsequent developments, or, as to discovery, were satisfied in one way or another. Many of his complaints about trial activity demonstrate a lack of comprehension of legal rules; others simply manifest dissatisfaction with results. It suffices to state that the record belies many of these numerous complaints; others resulted from sound pre-trial and trial judgment decisions by the attorney; many simply have no merit.[1]
*1030 THE CONFESSION
Again in great detail and with exhaustive argument, petitioner contends that his confession may have been erroneously recorded (or manipulated mechanically) and that he had an alibi for all three of the burglaries of which he was convicted. Yet, he argues, his counsel failed to investigate, to hire or have furnished by the state investigators and technilogical experts, and to run down and produce witnesses to establish the alibi. These arguments apparently recognize the inherent incompatibility of a confession and an alibi; so petitioner attacks the confession first.
At the time of his arrest, petitioner was found in possession of much property taken in burglaries, and he was found to have pawned or sold other such property. After full warnings of constitutional rights (with which he was thoroughly familiar), he was interrogated at one sitting about numerous burglaries. The tape-recorded statement was played in its entirety at the preliminary examination and dealt with numerous burglaries, other parties and some of petitioner’s activities with respect to property obtained from other burglaries.
When tried on the three counts of which he was convicted, petitioner through counsel agreed to the editing of the preliminary examination transcript to delete any reference to any other offense and to delete all statements that did not clearly relate to one of the crimes being tried.[2] Only the introductory part of the tapes themselves were played for the jury in order that they could evaluate the circumstances, the voices and the rights waiver. No evidence even remotely or inferentially relating to any other of petitioner’s activities reached the jury from the reading of the edited transcript.
Petitioner has apparently had access to a transcript made elsewhere (perhaps by a police stenographer which are sometimes provided to defense counsel at early stages). He contends it contains many references to “inaudible” portions of the tapes and that he demanded technical study of the tapes. He thus implies that there may have been technical flaws in the recording, or even deliberate alterations or “forgery.” As will be demonstrated hereafter, petitioner clearly confessed to the three offenses of which he was convicted; and there is not one shred of evidence suggestive of error or manipulation in the tapes. In fact, he himself sent for an investigator from the district attorney’s office in order to give the statement.
THE ALIBI
While briefly in this area, petitioner used the alias Barry Dorff. As he himself explained in his confession, he found “some identification" and “hooked up the rest of the idea to go with it.” Shortly after his arrest here, he began trying to come up with an alibi.
*1031 The Hinkle residence (count 1 of the bill) was burglarized during the daytime on November 25, 1978. The residence of Dr. and Mrs. Wright was burglarized on December 9, and the Montgomery residence on December 10 (counts 7 and 8). Some time after his confession on December 19, petitioner gave his attorney, Mr. Smith, the name of one Gaines E. Byrd in Conroe, Texas, as a former employer. Smith wrote to Byrd on January 22, 1979, seeking information about petitioner’s employment record.
At some unknown time thereafter, Smith received an undated letter which referred to payroll records on Barry T. Dorff. It indicated such a person had allegedly worked for Byrd Drilling Company, Inc., “in the Ruston, LA area” from November 25, 1975, until December 9, 1975. Later, after petitioner’s return to Louisiana and Smith’s relief as his attorney, Smith gave that letter to Lain.
Lain could not square the listed dates with the crimes, or be certain that petitioner was the person about whom Byrd wrote. Yet, petitioner continued to insist upon efforts to tie down the alleged alibi; and Lain wrote Byrd. He got no response and could not make direct contact with Byrd. Because of the confession, the alias and the dates specified in the original letter from Byrd, Lain had no confidence in the alleged alibi and made no further effort to pursue it. At this hearing, Lain denied he had ever heard of Pedro Reyes or John Gaskin and contended that Byrd was the only person named by petitioner to him.
At this hearing, petitioner produced another letter from Byrd to Smith’s firm. It is dated June 5, 1984 (after petitioner’s conviction) and changes the critical dates from 1975 to 197& Otherwise, it is identical to the first letter. Petitioner’s counsel also stated that Byrd was not present to testify but that he had sent copies of time records on contract work by his firm in November and December, 1978. It was stipulated that if present, Byrd would identify the letters as containing information taken from time records and the other two exhibits as copies of driller’s activity reports, but that he himself did not have personal knowledge of the facts so revealed.
Petitioner contends this evidence establishes an alibi, belies his confession, would have exonerated him and convicts his attorney of gross neglect in failing to investigate, locate the necessary witnesses and enforce their appearance at the trial. His contentions are sound only if analysis reveals that the production of such evidence would have likely resulted in a different verdict at the trial and thus that petitioner is entitled to a new trial.
The amended letter of June 5, 1984, shows that Barry Dorff allegedly worked in the Ruston area 10 hours on November 25, 1978, (the date of the Hinkle burglary) from 7:00 A.M. to 5:00 P.M., and that he allegedly worked 10 hours on December 9 (the date of the Wright burglary). However, it also states that Dorff called in on December 9 saying it was too cold to continue working and that he would contact the office later to get his check.
Strangely, the activity reports signed by Pedro Reyes as driller and John Gaskin as party manager show that the November work was in the Winnsboro area and that no holes were drilled on November 25 “due to surveyor error in line.” The December work was shown to be in the Ruston area.
There is no known evidence to identify Barry Dorff on the time records in fact to be the same person as petitioner — for ought we know, that person could have been the one whose “identification” petitioner said he found and appropriated for his own. Yet, even assuming arguendo that petitioner was that person and did report for work on those dates, there is no evidence as to precisely where in the “Ru-ston area” and “Winnsboro area” the work was done. Ruston is some 32 miles from Monroe; Winnsboro is about 37 miles; drilling and logging activity regularly goes on in those general areas between Monroe and those towns. Hence, even if he were on the job, petitioner was no more than one *1032 hour away from Monroe, probably much less travel time.
Moreover, both the Wright and Montgomery burglaries occurred at night, according to all the evidence, including petitioner’s confession. Giving full credit and all permissible inference and speculation to the alleged alibi, petitioner was not working when those burglaries occurred. According to his confession, he was living in a motel in West Monroe (or staying with confederates just outside West Monroe).
Superficially, one might surmise that if Dorff were petitioner, and if he were working in the Ruston area until 5:00 P.M. on November 25, 1978, doubt would be cast as to his participation in the Hinkle burglary. That offense occurred in the afternoon. Even so, his confession completely belies the alleged alibi.
As previously stated, petitioner sent for investigators from the district attorney’s office to discuss the cases with them. Those persons had not investigated the crimes nor participated in the arrest and seizure of property; and they were not familiar with details. Petitioner told them about two confederates he had originally met in California, who allegedly planned the series of burglaries. He described generally the route across the bridge from West Monroe, left or north up Riverside to the Hinkle residence. His account of some of the characteristics of the Hinkle residence and its surroundings and the method of entry was consistent with other trial testimony. He mentioned going south from the bridge on South Grand Street for the other two burglaries, describing the general location of the Wright and Montgomery residences, mentioned “that doctor’s house” without any suggestion from his interrogators. He also said the latter two burglaries were committed a night or two apart.
The trial evidence revealed that petitioner pawned (or sold, as he stated it) some of the property taken from the burglaries and was caught preparing to leave town with other property in his vehicle and motel room. In short, the evidence of his guilt was overwhelming, rendering the alleged alibi evidence useless.
Finally, at the sentence proceedings, petitioner stated that while he was not certain about all of the specific burglaries of which he was convicted, he was “in three or four.” There can be no reasonable doubt of petitioner’s guilt and the questionable alibi evidence could not have affected the verdict had it been presented. See State v. Prudholm, 446 So.2d 729.
APPELLATE PROCEDURE
Petitioner also second-guesses his trial counsel for alleged lack of interest and failure to pursue appellate relief diligently. Counsel appealed and prepared several assignments of error. However, realizing that several had no merit, he concentrated on a prescription issue and the sentence. There was no merit in the other assignments.
SUMMARY
Encouraged by court-made rules concerning free attorneys, free services, law libraries, clerical assistance and similar concepts, and desiring to avoid the consequences of their own conduct, many criminals have learned to pressure appointed attorneys to “try the system” and to continue post-conviction attacks upon them. They have become superficially conversant with legal terms and procedures; and they frequently demand frivolous and time-consuming activities by appointed attorneys in the pre-trial and trial stages. Even more encouraged and delighted by post-conviction court decisions having little relationship to the issue of guilt or innocence, they belabor the system with irresponsible allegations to seek at least a temporary respite from prison for an evidentiary hearing at the trial court level or hopefully some highly technical result to give them another chance to “beat the rap.” Ineffective assistance of counsel is one of their favorite approaches and seems to be the more successful.
*1033 As a result, many attorneys are understandably self-protective; and they frequently yield to demands of the accused or themselves pursue useless activity in the hope of avoiding (or successfully defending) post-conviction assaults upon their ability and integrity. Countless thousands of man-hours and court time are wasted on frivolous motions and objections; and countless millions of tax dollars are spent dealing with such matters — all without any cost or consequences to the criminal himself.
In this matter, Mr. Lain dealt with the basic facts of the case — the most cogent of which were the physical evidence and the confession. He focused his efforts upon those issues which had substance; and while he listened to and evaluated petitioner’s ideas and gimmicks, he had the professional courage and integrity to make sound professional judgments about how his and the system’s time and money should be spent in defense of the specific charges against petitioner. This Court will never subscribe to the theory that it is an attorney’s duty to permit the client to dictate his activity and procedure — irrespective of ethics or law — or the responsibility of the court system to assist a guilty person to beat the rap by clever manipulation of rules and procedures.
The petitions for post-conviction relief because of alleged ineffective assistance of counsel are DENIED.
/s/ Robert T. Farr Robert T. Farr, Judge

. One of the complaints is that counsel did not discuss with petitioner a "plea-bargain” which *1030 would have permitted him to plead guilty to one count and escape prosecution on all others. The evidence fails to establish any validity in this contention.
On the day or night before the trial was to begin, the assistant district attorney recently assigned to the case called Lain at home and asked about a plea to one count if he could get approval from his boss. Lain told him petitioner had steadfastly refused to consider any guilty plea.
The young prosecutor had been encountering great difficulty in assembling witnesses and proof for the trial and was somewhat "panicky" at that stage about whether he could get it all together in time. He had not even suggested such a plea to anyone before his call to Lain. In fact, he gave up on four counts and dismissed them when the trial commenced; and there is no evidence that he would or could have received approval of (or even himself wanted) such a plea when the trial actually began.
Lain would not swear he discussed that "bargain” with petitioner, although he believes he did. In any event, he knew it was not approved by the district attorney and that the prosecutor did not have the authority to offer it or enter into such an arrangement. He also knew that petitioner (and he himself) believed that his motion to quash for failure to prosecute within two years would ultimately be sustained and that petitioner had steadfastly refused to consider any plea of guilty. There was, in fact, no opportunity for petitioner so to plead.

. Counsel preserved his client’s objection to the earlier denial of his motion to suppress the statement.