# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE

NEWS RELEASE #049

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **25th day of October, 2024** are as follows:

**PER CURIAM:**

2023-KP-00864    *CHERI HAYDEN VS. FREDERICK BOUTTE, WARDEN (Parish of Jefferson)*

REVERSED AND REMANDED. SEE PER CURIAM.

SUPREME COURT OF LOUISIANA

No. 2023-KP-00864

CHERI HAYDEN

VS.

FREDERICK BOUTTE, WARDEN

On Supervisory Writ to the Twenty-Fourth Judicial District Court, Parish of Jefferson

**PER CURIAM:**[*]

We granted the State's application to review the court of appeal's determination that defendant was entitled to a new trial on collateral review because she received ineffective assistance of counsel at trial. After carefully reviewing the record, we find that the court of appeal erred in failing to give due deference to the district court's credibility determinations. For the reasons that follow, we find that, even assuming counsel error, defendant failed to show prejudice under the *Strickland* standard. Accordingly, we reverse the ruling of the court of appeal, and we remand to the court of appeal with instructions to address pretermitted claims.

In 2009, a unanimous Jefferson Parish jury found defendant guilty as charged of second degree murder. The victim died from injuries sustained when she was run over by a truck in a grocery store parking lot in Marrero during a purse snatching. The driver of the truck was accompanied by Michael Coe, who grabbed the victim's purse from the front seat, and Matthew Vinet, who was the truck's owner and was sitting in the back seat. Vinet confessed to his involvement in the crime and identified defendant as the driver. Defendant, who was 45 years old with

---

[*] Justice Jeannette Theriot Knoll, retired, appointed Justice Pro Tempore, sitting due to the vacancy in Louisiana Supreme Court District 3.

deep facial lines, denied any involvement in the crime. She claimed that at the time of the crime, she was at her father's house taking a bath and preparing food for her granddaughter's birthday scheduled later that day. She indicated at trial that she arrived at the party over an hour after the crime took place.

Two eyewitnesses, Tabitha Chiasson and Connie Dutreil, identified defendant as the driver from a photo lineup. They each expressed a high degree of certainty of their identifications throughout the trial and denied that the police suggested any particular person to select from the lineup. Chiasson claimed that she attempted to help the victim during the purse snatching in the parking lot. She told the police that the driver was a "skinny" and "very pale" white woman in her "mid-thirties," with "long strawberry blonde hair" and "bluish green eyes." At a pretrial hearing, she testified that she thought the driver was "around late 30s or early 40s." At trial, she described the driver as "crack-head skinny," with "pasty-white" skin and "kind of strawberry-blond hair, long; kind of greenish eyes, greenish-blue eyes, I think, like you know. Actually [h]azel; everything is [h]azel." She also indicated that she got "up close" to the driver and that they looked directly at each other.

Dutreil, whose vehicle was hit by the truck involved in the purse snatching shortly after it pulled out of the grocery store parking lot, told the police that the driver was a "young girl about in her twenty's . . . [m]aybe her middle – late twenty's early thirties," with "light colored," "shoulder length" "[b]londe . . . brown hair," wearing sunglasses. Dutreil indicated at trial that she was able to get a good look at the driver. She stated that when the impact occurred, she and the driver looked at each other, and the driver took off. She testified at trial that the driver's hair was "two-toned" "[b]lond and brown[,]" that the driver was wearing sunglasses, and that the driver appeared "in between her twenties and thirties."

Warren Pitre, who witnessed the purse snatching in the grocery store parking

2

lot, did not provide an identification of the driver. Pitre told the police that he only got "kind of a glimpse" of a woman in the front seat and could only describe her as having blond hair. He testified at a pretrial hearing that he could not see the driver's face but observed that she had long blond hair. He testified at the same hearing that he unsuccessfully tried to grab the victim as she slipped underneath the truck and had not noticed anyone else trying to help her at the time. Pitre was not called to testify at trial.

The lead investigator from the Jefferson Parish Sheriff's Office, Lieutenant Donald Meunier, testified that Jessica Billiot, who was Vinet's girlfriend at the time of the crime, was never considered a suspect. He stated that while Billiot's DNA was found on cigarette butts in Vinet's truck, and defendant's DNA was not found in the truck, police did not find this remarkable because it was established that Billiot was Vinet's girlfriend and that she used his vehicle. Lieutenant Meunier described Billiot as a white brunette in her 20s. The State introduced as evidence three photos of Billiot, all depicting her with dark hair, and when the State asked Lt. Meunier whether he believed that there was "even the slightest resemblance" between defendant and Billiot, he replied, "I don't think so, no."

Billiot was called as a defense witness at trial. She testified that she had gotten into a fight with Vinet on the day of the crime and had parted ways with him before the crime occurred. She denied being in the truck at the time of the crime. She testified that she went shopping with her roommate's mother on the day of the crime. Billiot further denied that she had ever had blond hair. On cross-examination, the State asked no questions but only had Billiot take her hair down for the jury.

The jury found defendant guilty as charged of second degree murder. The trial court sentenced defendant to life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence. The court of appeal affirmed

defendant's conviction and sentence. *State v. Hayden*, 09-954 (La. App. 5 Cir. 5/11/10), 41 So.3d 538, *writ denied*, 2010-1382 (La. 1/14/11), 52 So.3d 899.

In 2018, defendant, represented by the Innocence Project of New Orleans (IPNO), filed an application for post-conviction relief, in which she claimed that: (1) she received ineffective assistance of counsel at trial, (2) the State withheld *Brady* material, (3) the State presented false testimony in violation of *Napue*, (4) the cumulative impact of ineffective assistance of counsel and *Brady* violations entitled her to a new trial, and (5) she has shown that she is factually innocent. She twice supplemented her application for post-conviction relief before the district court conducted an evidentiary hearing on her claims in 2022, at which several witnesses testified. We do not summarize the testimony here, other than to note that defendant essentially claimed that she was misidentified, Chiasson has since recanted her identification, counsel failed to investigate witnesses who could have confirmed defendant's alibi, counsel failed to discover weaknesses in the identifications, and counsel failed to adequately investigate Billiot as an alternative suspect.

The district court denied post-conviction relief. The district court issued written reasons addressing each of defendant's claims, which we do not summarize here other than to note that the trial court made several credibility determinations before finding, *inter alia*, that defendant failed to establish prejudice under the standard of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).[1]

---

[1] Under the standard for ineffective assistance of counsel set out in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), a reviewing court must reverse a conviction if the defendant establishes (1) that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms; and (2) counsel's inadequate performance prejudiced defendant to the extent that the trial was rendered unfair and the verdict suspect. The *Strickland* test of ineffective assistance affords a "highly deferential" standard of review to the actions of counsel to eliminate, as far as possible, "the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065.

The court of appeal reversed and granted a new trial. *Hayden v. Boutte*, 22-0244 (La. App. 5 Cir. 4/26/23), 369 So.3d 844, *as clarified on reh'g* (May 23, 2023). The court of appeal found that trial counsel provided ineffective assistance by failing to adequately investigate defendant's case. Specifically, the court of appeal found that counsel erred in failing to interview Chiasson and Dutreil, and that had he done so, counsel would have discovered discrepancies in their identifications that could have been used to impeach them at trial and cast doubt on their identifications. The court of appeal also found that counsel could have discovered that, as Chiasson testified at the evidentiary hearing, she felt pressured by investigators to provide an identification and that one of the investigators placed a thumb near defendant's photo while showing her the lineup. The court of appeal also found that counsel erred in failing to interview Pitre, as his pretrial testimony that he did not notice anyone helping the victim could have been used to cast doubt on Chiasson's claim that she helped the victim during the crime. The court of appeal also determined that had counsel interviewed Pitre, counsel could have discovered that Pitre, as he alleged at the evidentiary hearing, told the police that the driver was a "young girl" in her "twenties," which would have cast doubt on the identification of the 45-year-defendant as the driver.

The court of appeal also found that counsel erred in failing to adequately investigate Billiot as an alternative suspect, as she more closely matched the age description provided by eyewitnesses. The court of appeal found that had counsel adequately investigated her, he would have discovered inconsistencies in her alibis to the police that could have been used to impeach her at trial. The court of appeal also found that counsel would have discovered two witnesses who could have discredited her alibis. The court of appeal further found that counsel would have discovered witnesses claiming that Billiot confessed to them that she had been involved in the crime, as well as witnesses claiming that Billiot had blond hair at

5

the time of the crime, with one of whom testifying at the evidentiary hearing that she saw Billiot dyeing her hair from blond to brown sometime after the crime.

Finally, the court of appeal found that counsel erred in failing to adequately investigate defendant's alibi or to call any witnesses who attended the party on the day of the crime. The court of appeal found that counsel further erred in failing to subpoena reluctant witnesses to compel them to testify at trial.

The court of appeal found that the above errors above prejudiced defendant, as they infected the entire trial and left her with an incomplete defense. The court of appeal found that counsel's inadequate investigation led the jury to believe that the State's case was stronger than the evidence presented at the evidentiary hearing now suggests.

Because the court of appeal granted relief on grounds of ineffective assistance of counsel, it pretermitted discussion of the remainder of defendant's claims.

The court of appeal subsequently granted the State's petition for rehearing for the limited purpose of clarifying its decision. Specifically, the State complained of an error in the first sentence of the court's conclusion paragraph, which stated as follows:

> The record in Cheri Hayden's case is replete with evidence supportive of Cheri Hayden's entitlement to a new trial; *and although the inadequate police investigation and the prosecution's withholding of material and favorable evidence in this case merit granting Cheri Hayden a new trial*, we find that the real harm to Cheri Hayden's case was the deficient performance of Cheri Hayden's trial counsel.

*Id.*, 22-0244, p. 45, 369 So.3d at 874 (emphasis added). The State argued that the emphasized portion constituted a judicial finding on claims pretermitted by the court. The court of appeal therefore amended the ruling as follows to remove the implication that its finding was based on any claim other than ineffective assistance of counsel:

6

The record in Cheri Hayden's case is replete with evidence supportive of Cheri Hayden's entitlement to a new trial; and although the inadequate police investigation and the prosecution's withholding of material and favorable evidence in this case *may* merit granting Cheri Hayden a new trial, we find that the real harm to Cheri Hayden's case was the deficient performance of Cheri Hayden's trial counsel.

(emphasis added).

After reviewing the record, the briefs and arguments of the litigants, and the court of appeal's opinion, we find that the court of appeal erred in failing to give due deference to the district court's credibility determinations.[2] A review of the evidentiary hearing transcript supports the district court's finding that certain witnesses lacked credibility. Several witnesses expressed a degree of difficulty remembering details from 2008 and/or difficulty with memory in general. The district court was in the best position to judge the demeanor and tone of the witnesses, and nothing suggests that the district court's credibility determinations were unreasonable in light of the record.

Furthermore, nothing suggests that the district court erred in rejecting Chiasson's recantation.[3] Chiasson contradicted herself several times during the

---

[2] *See Rosell v. ESCO*, 549 So.2d 840, 844 (La. 1989) ("When findings are based on determinations regarding the credibility of witnesses, the manifest error—clearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said."). This court further stated in *Rosell*, 549 So.2d at 844 (citations omitted):

> It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. . . . The appellate review of fact is not completed by reading only so much of the record as will reveal a reasonable factual basis for the finding in the trial court, but if the trial court or jury findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong.

[3] It is well-settled that courts view recantations "with utmost suspicion." *See State v. Prudholm*, 446 So.2d 729 (La. 1984); *State v. Clayton*, 427 So.2d 827, 833 (La. 1982) (courts must view recantations with "utmost suspicion" because recanting "is tantamount to an admission of perjury which would destroy the credibility of the witness at a new trial.").

evidentiary hearing, and she also agreed that she had a degree of difficulty in remembering details. Chiasson had been consistent and confident in her description and identification of defendant throughout the police investigation and trial proceedings. At a pretrial hearing, she stated, "[O]bviously this woman is engraved into my head for the rest of my life." She also stated, "I can't be any more sure. These people for the rest of my life are stuck in my head." Notably, Chiasson did not recant her testimony until IPNO visited her twice at her home and showed her photographs of Billiot roughly a decade after the crime. Moreover, Chiasson denied at trial that the police suggested any particular person for her to select from the lineup, and she specifically denied that any investigators placed a thumb near defendant's photo.

Additionally, because defendant admitted that she arrived at the party well after the crime took place, trial counsel's decision not to call witnesses who claimed to have seen defendant at the party was not unreasonable, as they could not have accounted for defendant's whereabouts at the time of the crime.

However, the record also contains evidence suggesting that trial counsel's performance may have been deficient in some respects. The trial transcript reflects that counsel was unprepared to question Billiot, as he failed to challenge her when she provided an alibi at trial inconsistent with her police statements. He also elicited testimony from Billiot denying that she was in the truck at the time of the crime and that she ever had blond hair, which also went unchallenged. Counsel's decision to call Billiot without adequate preparation therefore likely hurt rather than helped defendant's case.

Likewise, trial counsel arguably erred in failing to interview individuals Billiot claimed to have been with on the day of the crime, both of whom testified at the evidentiary hearing that she was not with them that day. Prevailing professional norms would likely require an attorney to investigate any individual who had a

8

close tie to one of the perpetrators and who told the police that she had been with him prior to the crime, especially, as was the case here, when an anonymous tip was made regarding her possible involvement in the crime. Counsel's decision not to do so was arguably unreasonable, particularly where defendant's own alibi was thin and only verifiable by biased witnesses—specifically, her father and stepmother—who claimed to have been with defendant at their home at the time of the crime.

Trial counsel's decision not to interview Pitre was also arguably unreasonable, as his testimony could have been used to discredit Chiasson's version of events. However, counsel did not err insofar as failing to interview or call Pitre as a witness regarding his identification, or lack thereof, of the driver. Nothing aside from Pitre's testimony at the evidentiary hearing suggests that he ever provided a description of the driver's age or described her as "young" to either the police or anyone representing defendant leading up to trial. Rather, the record suggests the opposite, in that when the police asked Pitre whether he could describe the driver, he could only offer that she had blond hair. Pitre testified similarly at the pretrial hearing, stating that he could not see the driver's face. Additionally, the record supports the district court's determination that Pitre, who was 81 years old at the time of the evidentiary hearing, was incompetent to testify at the hearing, as the transcript reflects several clear lapses in memory generally and an inability to accurately recall basic details surrounding the investigation.

Trial counsel's decision not to interview Chiasson and Dutreil prior to trial was also arguably unreasonable. In particular, the gap between Dutreil's initial age description and the age of defendant, who appeared older than her age of 45 at the time, was arguably large enough to have prompted counsel to interview them regarding their identifications.

Nonetheless, even if counsel's performance was deficient, the district court

9

did not err in determining that defendant failed to show prejudice under *Strickland*. To show prejudice, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068. Moreover:

> In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors. . . . [T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results.

*Id.*, 466 U.S. at 695–96, 104 S.Ct. at 2069.

Here, nothing presented at the evidentiary hearing persuades us that the jury's verdict would have been reasonably likely to be different or that the trial here was fundamentally unfair. The trial transcript reflects that Chiasson and Dutreil both expressed extreme confidence in their identifications of the driver and denied that investigators suggested an individual to select from the photo lineup. Chiasson testified at a pretrial hearing and at trial that it took her longer to identify the man sitting in the passenger side of the truck than to identify defendant as the driver, whom she recognized "right away[,]" and Dutreil was unable to identify the male passenger at all. Given that Chiasson and Dutreil were both willing to admit

to some degree of uncertainty regarding the male passenger, both witnesses presumably would have been comfortable expressing any uncertainty they may have had in identifying the driver as well.

Additionally, the jury heard Dutreil testify that she estimated the driver to be "between her twenties and thirties" when she saw her immediately following the crash, and nonetheless found her identification credible. Moreover, whether Chiasson or Dutreil would have recanted their identifications prior to trial had counsel interviewed them or shown them a photograph of Billiot is purely speculative, especially considering the high degree of certainty they expressed in their identifications at that time. It is even less likely that Dutreil would have recanted her identification prior to trial, as she remains confident in her identification to this day.

Additionally, it is unclear whether trial testimony from Pitre contradicting Chiasson's version of events would have had an appreciable effect on the outcome. Dutreil's confidence in her identification arguably bolstered Chiasson's equally confident identification to the extent that Pitre's recollection of events may not have affected the jury's determination of Chiasson's credibility. The record also indicates that another eyewitness told the police that he saw a woman helping the victim during the crime, which would have served to confirm Chiasson's account.

Accordingly, we grant the State's application and reverse the opinion of the court of appeal, which granted defendant a new trial based on ineffective assistance of counsel under the *Strickland* standard. We find that the district court correctly denied relief under *Strickland*. However, because the court of appeal did not address all of defendant's claims, we remand to the court of appeal to consider the pretermitted claims.

**REVERSED AND REMANDED**